**UNITED STATES of America**

v.

**Bessie Jones UNDERWOOD.**

**UNITED STATES of America**

v.

**Bobbie Nell SIMPSON.**

**UNITED STATES of America**

v.

**James COLVIN.**

**UNITED STATES of America**

v.

**Spiver Whitney GORDON and Frederick Douglas Daniels.**

Nos. CR 85–G–197–W, CR 85–AR–198–W, CR 85–P–199–W and CR 85–HM–200–W.

United States District Court, N.D. Alabama.

Sept. 11, 1985.

Frank W. Donaldson, U.S. Atty., Tommy E. Tucker, Asst. U.S. Atty., for the U.S.

Henry Sanders, J.L. Chestnut, Jr., Selma, Ala., and John H. England, Tuscaloosa, Ala., and Chestnut, Sanders, Sanders, Turner & Williams, Birmingham, Ala., William Kunstler, New York City, and Thomas M. Meyer, Point Richmond, Cal., Carlos A. Williams, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

On July 29, 1985, each of the defendants in these four cases either filed or adopted a motion attacking the fixing of the boundaries of the three federal judicial districts in Alabama as unconstitutional. This attack was based on the allegation that the boundaries were purposefully drawn in order to dilute the heavily black juror pool in the so-called Black Belt of Alabama by distributing it among the three federal districts. Upon being put to the proof, de-

fendants wholly failed in their burden of proving that Congress had such an invidious intent in the early 1900's when the districts were so drawn, and defendants' motions to dismiss the indictments on this ground were denied on August 19, 1985. Defendants had on July 10, 1985, mounted an alternative attack on the system of jury selection. Their motions charged that "black persons, black males, rural residents, rural blacks and other cognizable groups in the Northern District of Alabama are systematically underrepresented in the pools for which grand and petit juries are chosen, and white males are systematically overrepresented, in violation of the Sixth Amendment requirement that juries be drawn from a cross-section of the community and in violation of the equal protection clause of the Fifth Amendment of the Constitution of the United States". An evidentiary hearing was conducted on the issues presented by this motion. Defendants offered no evidence in support of many of the specific allegations of their motion. For instance, defendants offered no evidence to indicate any disparity or underrepresentation by black persons, black males, rural residents, or rural blacks. The focus shifted to three basic contentions:

1. That an alleged cognizable group of "white males" is systematically overrepresented in the jury pool in the Northern District.

2. That this alleged overrepresentation of "white males" is or may be occasioned by the use of voter registration lists in the 31 counties in the Northern District as the sole source for potential jurors.

3. That there are elements in the jury selection system which are not statistically "random" so that elements of subjectivity have crept into the system, rendering it constitutionally defective and violative of the federal statutory requirements for jury selection.

Defendants' motions involve an across-the-board attack on two of the basic concepts contained in the jury plan employed as part of the federal judicial system in the Northern District: (1) district-wide jury selection as opposed to separate jury pools for the seven separate divisions within the Northern District; and (2) use of voter registration lists as the sole source of names for the original jury pool.

Roger Friedman, an expert witness offered by defendants, is a member of an entity known as the National Jury Project. He made no bones about his criticism both of the use of district-wide jury selection and of the exclusive use of voter registration lists for the jury pool. From a broad philosophical or political perspective a legitimate argument can be made against both of these practices employed by the Northern District. In fact this court would be the last to argue that the jury selection system it heard described in this evidence is perfect. However, "imperfect" and "unconstitutional" are not synonyms. Significantly absent from defendants' argument is any citation of authority or any reference to any pronouncement by an appellate court controlling on this court, saying either that district-wide jury selection is unconstitutional or that exclusive use of the voter lists is unconstitutional. To the contrary, 28 U.S.C. § 1861, expressly recognizes that the district courts shall select their juries "[A]t random from a fair cross-section of the community in the *district or division....*" (emphasis supplied). Congress clearly recognizes the right of district courts to establish either of these alternative methods, "district-wide" or "by division". Nothing in this language requires geographic subdivisions or any sort of geographic proportionality. Logic, of course, dictates that if a district-wide system is selected people in the various counties in the district must have an equal opportunity to serve on juries based on the respective relative populations of the various counties. There was nothing in the evidence, however, to indicate any such lack of proportionality in the Northern District. James E. Vandegrift, Clerk of this court, testified. He gave his own personal opinion that one reason the Northern District selected a district-wide jury selection system was to obtain a jury pool closely

representative of the racial percentages across the entire district, no matter where the cause of action arises or in what division the case will be tried. Mr. Vandegrift's opinion, if and only if it should inferentially reflect a concern of the Northern District itself, would not and does not manifest any racially invidious or discriminatory motive. If the writer, without any concrete evidence of the *actual* reasons for adopting a district-wide jury plan, were asked to deduce a rationale for it from his own observations, he might reason, based on his own experience sitting as a trial judge in four of the seven divisions within the Northern District, that not many district courts in the United States have as many as seven different divisions, with federal courthouses at eight different locations (the Northeastern Division has two courthouses), and further judicially knows that it would be a virtual administrative impossibility simultaneously to select and to impanel seven juries, each exclusively coming from residents in its separate division, all in one week. The seven active judges sitting on this court, even if the Northern District acquired a substantially increased staff charged with the jury selection process, would still find it awesome even to contemplate the logistics of impaneling seven separate juries, at seven separate locations, from several different jury pools, on one day. It would be an unholy mess. This court would assume that anyone charged with a reexamination of the decision to use a district-wide pool would look long and hard at all of the ramifications of a change.

■ The other sweeping criticism of the Northern District's system is its exclusive use of voter lists to acquire the names of potential jurors. This criticism runs into the express recognition in 28 U.S.C. § 1863(b)(2), that lists of registered voters or lists of actual voters can be used. In the opinion of this court "actual voter lists" would create a narrower base than "registered voter lists", and one less reflective of a cross-section than the voter registration lists themselves, and yet the statute would permit it. The lists used by the Northern District contain *all* registered voters, whether they voted in a particular prior election or not. The review panel of the Eleventh Circuit which in 1983 approved the jury plan suggested by the Northern District and subsequently adopted by the Northern District, obviously was aware that the Northern District's system used the voter lists obtained from the voting officials in each county in the district. Furthermore, the Eleventh Circuit has specifically found that the use of voter lists as a sole source for potential jurors does not necessarily violate either the Sixth or the Fifth Amendment. *Bryant v. Wainwright*, 686 F.2d 1373, 1378 (11th Cir.1982). Some defendant may be able to persuade the Eleventh Circuit, or the Supreme Court, to steer a new course and to agree with the recent majority of the Supreme Court of California in *People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (1984), which concluded that the exclusive use of voter lists for the jury pool is unconstitutional. Of course this expression by the Supreme Court of California is not controlling on this court, which finds the dissent of Justice Mosk at 679 P.2d 456, in which Justice Richardson concurred, more persuasive than the opinion of the California majority. Justice Mosk said in pertinent part:

If some counties choose to use lists other than the voters' registration for selection of jury panels certainly they may do so. But is a county constitutionally compelled to do so, and if it does not, should its omission be deemed justification for reversal of a conviction obtained on overwhelming evidence? Unlike the majority, I would answer those questions in the negative.

I pause at the outset to observe that the statistics upon which the defendant relies contain a major gap. Dr. Butler's survey revealed that on the *Long Beach* jury panels 5.5 percent were Black and 3.4 percent were Hispanic. He then takes a quantum leap to note that the estimated population figures for *Los Angeles County* —including persons who

are under 18 and those who are aliens, legal and illegal—are 15 to 17 percent Black and 33 percent Hispanic in 1980.

The leading cases on the subject of jury selection (e.g., *Taylor v. Louisiana* (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; *People v. Wheeler* (1978) 22 Cal.3d 358, 148 Cal.Rptr. 890, 583 P.2d 748) require that a defendant be provided trial by an impartial jury drawn from a representative cross-section of the *community*. Our code uses the term "area served by the court" (Code Civ.Proc. § 197), not the county in which the court is situated. It takes only a cursory knowledge of the demography of Southern California to realize that Long Beach courts serve an area completely distinct in population characteristics from the totality of Los Angeles County. Indeed, Long Beach is closer to the county seat of Orange County (21 miles) than it is to the county seat of Los Angeles (23 miles). The defendant has produced no statistics relating to the ethnic composition of the community or area that is Long Beach, or from the supervisorial district in which the city is located (see Code Civ.Proc., § 206a). Figures for the entire County of Los Angeles are not only irrelevant but in this instance significantly deceptive.

On the more fundamental issue, I perceive no persuasive reason to prevent exclusive reliance on voters' registration lists. They are specifically authorized by Code of Civil Procedure section 204.7. These lists include persons who are citizens, of legal age, men and women; they represent all parts of the community, the area and the county; they are drawn from all economic strata, every occupation, all races, religions and political ideologies.

Citizens may become registered voters at no cost and regardless of their ethnicity or financial well-being. This can be said of no other available list. Telephone books? Installation and use of a telephone costs considerable money these days, and, in addition, generally only the so-called "head of the household" is iden-tified. Automobile registration lists? Ownership of an automobile indicates a certain financial status, and here also, except in an affluent family, often only one owner per household is listed. Bank records, credit card lists, department store accounts, welfare rolls? All of these are indicative of a certain economic status. Property tax rolls? Ownership of real property is limited to persons with resources. Income tax records? If the state were to permit their use, eliminated would be those whose income or exemptions required them to pay no tax.

There is even a $6 charge for one to obtain an identification card issued by the Department of Motor Vehicles pursuant to Vehicle Code section 13000 et seq., and $10 for a driver's license pursuant to Vehicle Code section 12800 et seq. The lists of such licensees and ID card holders shall be used by jury commissioners "to the extent that systems for producing jury lists can be practically modified, without significant cost" (Code Civ.Proc., § 204.7). There are two answers to the rejection of these lists in the instant case: first, there is no showing that in a large metropolitan area this can be done "practically" without duplication and without significant cost; second, the lists do not represent a cross-section of the community, but only those persons with the initiative, motive and financial ability to apply for the licenses or identification cards, an effort considerably more complicated and costly than registering to vote. No statistics have been offered to indicate minorities are better represented on such lists than on voter registration lists, and there is good reason to believe they are not.

In short, any list one can suggest implies an elite status or a certain economic class and in most instances eliminates those of marginal or limited income. Only the voters' registration permits all citizens over 18 to be listed at no cost whatever and with a bare minimum of effort. Indeed prior to each election the two major political parties, and most mi-

nor parties, conduct vigorous drives to encourage citizens—often minorities in particular—to register, and county registrars enlist hundreds of solicitors to be available on street corners and in shopping centers for that purpose.

Obviously citizens identified as being among the minorities cannot be coerced into exercising their civil duty to register and vote, but constant efforts are undertaken to persuade them to do so. Why minorities are said to be less interested than others in participating in the most important of the privileges of democracy is, if true, a mystery that requires more sociological and psychological study than can be undertaken with the superficial data offered in this case. In any event I suggest that any citizen—whether in the majority or minority population—who steadfastly ignores or avoids his simple civil duty to register and vote would be likely to ignore or avoid his more onerous civic duty to serve on a jury. And if he were by some means identified and reluctantly compelled to perform jury service he would in all likelihood not be a conscientious juror, a circumstance that might adversely affect a criminal defendant's right to be tried by a serious and objective trier of fact.

Even if the view of the California majority should ever be embraced by the Supreme Court of the United States, its expression is not apposite in the instant case, because the defendants here offered no proof whatsoever that a different percentage of the black population than of the white population is registered to vote in the Northern District. For aught appearing in this record the registered voter rolls substantially mirror the distinctive cognizable groups in the overall community. The majority in *People v. Harris* did not find this to be true, and it was a crucial factor in their decision.

If the machinery used for jury selection in the Northern District is not deficient on its face, then, what about the *results* it has produced? Defendants contend that the Northern District's system has produced a systematic over-representation of white males. This is defendants' main contention. It bears careful analysis.

The first flaw in defendants' alleged overrepresentation of "white males" is that "white males" does not constitute a cognizable group in the context of jury selection discrimination cases. Defendants have not cited a single judicial decision which recognizes "white males" as a "cognizable group". Instead, they rely on the testimony of Alex Willingham, a political scientist who gave his opinion that white males share a cultural heritage and an attitude which, in his opinion, should cause them to be considered by the courts as a distinct sociological class. He offered a similar opinion about "Black Belt blacks". Defendants abandoned any contention that "Black Belt blacks" are the victims of disparate treatment under the jury plan, rendering Dr. Willingham's opinion as to "Black Belt blacks" academic. The court respectfully disagrees with Dr. Willingham's idea that "white males" constitute a "cognizable group". Not only does the court disagree with Dr. Willingham's conclusions, but the court rejects the concept of adding together "cognizable groups" so as to make a separate "cognizable group". An example of what defendants are here attempting can be stated as follows:

> Blacks constitute a cognizable group. Females constitute a cognizable group. Persons below the poverty level constitute a cognizable group. Catholics constitute a cognizable group. The elderly constitute a cognizable group. A social scientist might, with complete honesty, argue for a merger of the black, female, poor, elderly Catholics and find that the percentage of the group thus combined is terribly underrepresented or terribly over represented in the jury pool.

Of course the same principle is equally applicable to a merger of two cognizable groups, "whites" and "males". It is not blindness to reality or a reflection of white male chauvinism to venture the suspicion that there is as much commonality of perspective between white females and white

males as there is between Black Belt blacks and Jackson County blacks. If one had a truly suspicious nature one might suspect that the hopeful creation of a new class of "white males" is occasioned by the failure, upon a close demographic examination of the records, to find any cognizable group previously recognized by judicial decisions reflecting the degree of disparity which would come even close to rendering the jury pool constitutionally deficient.

■ The second fatal flaw with defendants' attack based on a "white male" class is defendants' allegation that this group is "*over* represented". Assuming arguendo defendants' standing to complain of each and every alleged constitutional infirmity in the jury selection process, the court finds no decision dealing with the *over* representation of a particular group as a constitutional infirmity. Defendants' primary reliance, is, as it must be, on *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), in which the Supreme Court set out the elements for determining whether or not a cross-section exists. However, the Supreme Court spoke in terms of "exclusion" not "over-inclusion", and of "underrepresentation" not "overrepresentation". As recently as August 6, 1985, the Eleventh Circuit in *Bowen v. Kemp*, 769 F.2d 672 (11th Cir.1985), quoted *Duren* as follows:

[T]he defendant must show (1) that the group alleged to be exluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this *underrepresentation* is due to systematic exclusion of the group and the jury-selection process.

P. 684 (emphasis supplied).

Perhaps if the jury plan in the Northern District called for jury selection by divisions and a Jackson County black should attack the system because blacks in the Northeastern Division are disproportionately *under* represented when considered in relation to the total Northern District popu-

lation, a legitimate question of alleged "*under* representation" would be presented. Here, however, the mere fact (if it be a fact) that "white males" are "*over* represented" does not implicate the Sixth Amendment.

■ Third, assuming arguendo that "white males" constitute a cognizable group, and that "overrepresentation" of such a group can render a jury selection process unconstitutional under the Sixth Amendment, the court nevertheless finds as a fact that "white males" are not "overrepresented" to a degree or in an absolute percentage which would implicate the Sixth Amendment. The Eleventh Circuit clearly holds that there must be a 10 per cent absolute disparity between the members of a cognizable group in the jury pool and those in a community as a whole before there is a Sixth Amendment question. *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir.1984). The credible evidence in this case indicates no such absolute disparity. If Mr. Friedman's findings were of a disparity in excess of 10 per cent, it was occasioned by a shortcoming in his statistical methodology.

■ The foregoing discussion has dealt with the Sixth Amendment. Defendants also charge a violation of the equal protection clause of the Fifth Amendment. While the Sixth Amendment "vouchsafes the right to be tried by a jury chosen from a group reflecting a fair cross-section of the community", *Bowen v. Kemp*, p. 683, "the equal protection analysis employs a prima facie case test virtually identical to the one used in the fair cross-section analysis". *Bowen v. Kemp*, p. 683. There is, however, this distinction between the two analyses. In order to prevail on an equal protection challenge, the defendant must show *purposeful* discrimination. *Duren*, 439 U.S. at 368, n. 26, 99 S.Ct. at 670, n. 26. "Hence, if the defendant makes out a prima facie case, the burden of proof then shifts to the state [federal government] to show the absence of discriminatory intent." *Bowen v. Kemp*, p. 684, n. 7. Because in the instant case defendants have not made

out a prima facie case of purposeful discrimination, the government was under no obligation to prove the absence of discriminatory intent. However, if the court's analysis is incorrect and if defendants are deemed to have made a prima facie showing of "purposeful discrimination" by the Northern District that this court has failed to detect, then the court finds as a fact that the government did meet its burden showing the absence of discriminatory intent. No discriminatory intent to prefer white males existed at the time the jury plan was being designed or adopted by the Northern District.

■ Although not specifically alleged in their motions, defendants were allowed the freedom to attempt to prove a lack of the statutorily required "randomness" in the jury selection process. Defendants' argument in this regard takes several tacks. Defendants first argue that the imperfection in the addresses of the voter registrants interrupts "randomness" and introduces an element of "non-chance". Defendants have simply proven a "fact of life", a fact which does not change the ultimate fact, namely, that the system was designed to operate in a purely random fashion. Next, defendants argue that a disproportionate number of requests for exclusion, and a disproportionate number of granted excuses, increases the overrepresentation of whites in the "recall pool", thus introducing a non-random or subjective element where "recall" jurors are concerned. If such a criticism can reach a constitutional dimension, then the only way to preserve absolute randomness would be to provide no warning to those selected for jury service, to send the U.S. Marshal to the residence of each juror with a pair of handcuffs (with an ambulance in the event the juror should be on his death bed) in order to insure his or her attendance, and not to allow any excuses. Such a system would avoid any exercise of discretion by a judge to whom a request for excuse should be addressed, and there would be no occasion for granting an excuse, either permanent or temporary.

A second part of the charge that the system in the Northern District is not "random", is based on the testimony of Gil Cash, the jury clerk, who testified that the jurors who obtain a *temporary* excuse and are therefore placed in the pool of "recall" jurors, are disproportionately white-to-black when measured against the general population and that in recognition of this undenied and undeniable fact he has, when using "recalls" not used purely random selection, but rather has picked more blacks than their percentage of the "recall" pool so that a particular venire will more closely reflect the white-black percentages within the total population. This criticism may have merit. However, assuming arguendo that defendants' motions adequately present this question as to "recall" jurors, and further assuming arguendo that defendants have standing to complain of a subjective selection process which *prefers* blacks (especially where no "recall" jurors are being employed in any jury being called for these defendants' four cases), the procedure is not only benign but its impact is *de minimis*. Under the "facts-of-life" analysis, the jury clerk is "damned if he does and damned if he doesn't". It is true that if he indulges in a little fudging in favor of blacks when using "recall" jurors, he violates the principle of random selection. If he does not do so, "recall" jurors will not be truly representative of the traditional cognizable groups. But, when examining any jury selection process for its "randomness" it must always be kept in mind that the definition of "randomness" employed by statisticians and the definition of "randomness" employed by the Eleventh Circuit in discrimination cases are not necessarily the same. The Eleventh Circuit's definition for use by this court in this case is less stringent and less exacting than Mr. Friedman's definition. *United States v. Bearden*, 659 F.2d 590, 602 (5th Cir.1981). A mere technical deviation from statistical perfection does not place an entire jury system in constitutional jeopardy. *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir.1984). In terms of pure statistical randomness, the legitimate criticism of the

system would be that the "universe" is skewed and not representative of the total population where the original pool either automatically excludes or allows excuses by non-English speakers, physicians, dentists, registered nurses, persons over 70 years of age, persons actually caring for a child under 10 years of age, soldiers, sailors, marines, coastguardsmen, airmen, policemen, firemen, FBI agents, public officials (including executive, legislative and judicial officers), persons with mental infirmities, persons with physical infirmities, persons with felony convictions, and perhaps others. It might be possible for Mr. Friedman, or Mr. Vandegrift, or Mr. Cash, or defendants' counsel, or the Administrative Office of the United States Courts, or even the writer of this opinion, to devise a plan which is better in several respects than the plan here under attack. For instance, if the use of a "recall" pool creates an absolute "disparity" beyond the permissible 10 per cent causing an underrepresentation of a cognizable group, and if Mr. Cash's personalized solution is unsatisfactory (which this court thinks it is), then perhaps a solution would be to forgive jurors who have a legitimate reason for not appearing for the venire for which they were summoned not temporarily but permanently and not to create a pool of "recalls". The questions in this case, however, are not whether the jury plan can be improved upon, and if so, how, but rather whether the plan, as it now exists, is constitutional. To this question the answer is "yes".

An order denying defendants' motions was entered on August 26, 1985. It recognized the court's obligation subsequently to write the foregoing opinion containing findings of fact and conclusions of law.