Ebeny GIVENS, Individually and as Next Friend of Toni J. Wright, A Minor, and Keith Wright, Individually, Appellants,

v.

M&S IMAGING PARTNERS, L.P., Baptist Imaging Center, M&S Imaging Partners I, Inc., and Gwendolyn Daigle, Appellees.

No. 06–05–00044–CV.

Court of Appeals of Texas, Texarkana.

Submitted April 19, 2006.

Decided June 13, 2006.

**736**

Jeffrey W. Jones, Law Office of Jeffrey W. Jones, San Antonio, for appellants.

Diana L. Faust, R. Brent Cooper, Cooper & Scully, PC, Dallas, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

In this appeal from a defense summary judgment, we are called on to revisit the recurring question of how attenuated the link can be between an allegedly negligent behavior and damage allegedly caused by that behavior, before the actor is no longer legally responsible for the damage. Simplifying this appeal, most of the defendants previously involved in this case are not before us: we are focused on the alleged negligence of an actor at the very beginning of a rather involved chain of alleged causation.

The allegedly negligent behavior was Gwendolyn Daigle's production of an ultrasound image of Ebeny Givens' uterus revealing the unborn Toni Wright—and Toni's unborn sibling—as well as Givens' cervix. Onto this allegedly substandard ultrasound image, Daigle had superimposed her apparently incorrect measurement of Givens' cervix, indicating the cervix was significantly longer than it really was. In a prior pregnancy, Givens had been diagnosed with a short cervix[1] and given a cervical cerclage—sutures around the cervix to strengthen a short or incompetent cervix[2]—allowing her to successful-

1. An unduly short cervix is considered a factor in premature births. According to the evidence, the cervical length is important be-cause when the cervix is too short there is a likelihood of premature delivery.

2. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 335 (30th ed.2003). When a cervix is unduly

ly carry a former pregnancy to term. Givens was not given a cerclage in this case.

The prematurely born Toni remained hospitalized for months after her birth, during which time Toni fell prey to a congestive lung condition and Givens incurred large medical expenses for Toni's care, both of which are problems often associated with premature births. Toni's lung condition continued after she was released to go home, where she continued to need a breathing tube and where her care was assisted by a home healthcare agency. The sad end to this part of Toni's story occurred later at her home, when her breathing tube clogged—a blockage not easily or quickly cleared—temporarily denying Toni oxygen and leaving her with severe brain damage. In this case, we consider the attenuation between Daigle's allegedly negligent behavior and two types of damage: (1) the medical expenses incurred during Toni's initial hospitalization and (2) Toni's brain damage.

Daigle and her codefendants filed a joint motion for summary judgment in which they alleged that their evidence conclusively negated an essential element of Givens' case: proximate cause. Alternatively, they asserted that Givens had presented no summary judgment evidence that any act or omission by Daigle was a proximate cause of the damages. The trial court granted the motion. We affirm the summary judgment because, based on the summary judgment evidence, as a matter of law, Daigle's alleged negligence is too attenuated from either type of damage alleged.

*Standard of Review*

In this case, we determine whether the summary judgment evidence presented to the trial court contained any evidence showing Daigle's actions were a proximate cause of the damages, or alternatively, if the series of events shown by that evidence showed, as a matter of law, that Daigle's actions were *not* a proximate cause of the damages.

In a traditional motion for summary judgment, the party moving for summary judgment carries the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex.1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant. *See Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). We indulge every reasonable inference to resolve any doubts in the nonmovant's favor. *Id.* A defendant who conclusively negates at least one of the essential elements of the plaintiff's cause of action is entitled to a summary judgment. *Little v. Tex. Dep't of Criminal Justice,* 148 S.W.3d 374, 381 (Tex.2004); *Thomas v. Farris,* 175 S.W.3d 896, 898 (Tex.App.-Texarkana 2005, pet. denied).

 A no-evidence summary judgment is essentially a pretrial directed verdict. We, therefore, apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *S. Disposal, Inc. v. City of Blossom,* 165 S.W.3d 887, 895 (Tex.App.-Texarkana 2005, no pet.). We must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *S. Disposal, Inc.,* 165 S.W.3d at 895; *Woodruff v. Wright,* 51 S.W.3d 727

---

short or incompetent, an appropriate action is to install a cervical cerclage, or other appro-

priate medical intervention, to help the pregnancy extend as close to full-term as possible.

(Tex.App.-Texarkana 2001, pet. denied). We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). A no-evidence summary judgment is improperly granted if the non-movant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70–71 (Tex.App.-Austin 1998, no writ). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711.

*Proximate Cause and Attenuation*

■ Proximate cause consists of both cause in fact and foreseeability. *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex. 1998). Because, in this case, the motion for summary judgment asserts there is no evidence Daigle's alleged negligence was a *cause in fact* of the injury, we address only that element.

■ Cause in fact is established when an act or omission was a substantial factor in bringing about the harm, and, without it, the harm would not have occurred. *Id.; Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995); *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992); *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 936 (Tex.App.-Texarkana 1997, writ denied). Cause in fact is not established where a defendant's negligence does no more than furnish a condition which makes the injuries possible. *Doe*, 907 S.W.2d at 477 (citing *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex.1968)). In other words, such conduct of a defendant is considered to be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 799 (Tex.2004) (citing *Doe*, 907 S.W.2d at 477; *Union Pump Co.*, 898 S.W.2d at 776; *Lear Siegler v. Perez*, 819 S.W.2d 470, 472 (Tex.1991)).

While the Texas Supreme Court has repeatedly addressed attenuation between conduct and liability, there remains a challenge on where to draw the line. *Lear Siegler* and *Mason* looked to the Restatement (Second) of Torts for clarification on this issue:

> a. *Distinction between substantial cause and cause in the philosophic sense.* In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. Except as stated in § 432(2), this is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. *The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause*, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. *Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.*

RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965) (emphasis added). This comment reinforces the necessity of a reasonable, significant causal connection between the

conduct and the harm, but still does not specify where to draw the line.

In addressing attenuation between conduct and liability, the Texas Supreme Court has addressed scenarios similar to the one before us. *See, e.g., Mason*, 143 S.W.3d at 799; *Union Pump Co.*, 898 S.W.2d 773; *Lear Siegler*, 819 S.W.2d 470. In *Mason*, the court confirmed its ruling in *Bell*, 434 S.W.2d at 117–18:

> In *Bell*, three individuals were hit by a car while removing debris from an earlier car accident. 434 S.W.2d at 118. Two of the men were killed, and the third suffered serious injuries. *Id.* We held that the initial accident was not the proximate cause of the deaths and injuries because it only created the condition that attracted the three men to the scene and did not actively contribute to the injuries resulting from the second accident. *Id.* at 122. Where the initial act of negligence was not the active and efficient cause of plaintiffs' injuries, but merely created the condition by which the second act of negligence could occur, the resulting harm is too attenuated from the defendants' conduct to consti-

tute the cause in fact of plaintiffs' injuries.

*Mason*, 143 S.W.3d at 799.

> Our precedents establish that merely creating the condition that makes harm possible falls short as a matter of law of satisfying the substantial factor test.

*Id.* at 800.

In *Taylor v. Carley*, a summary judgment case, a patient's primary physician's negligent conduct was held to be too attenuated, as a matter of law, from injuries caused by decisions of a subsequent physician.[3] *Taylor*, 158 S.W.3d 1. The Fourteenth District Court of Appeals stated that, while the harm would not have occurred without the first doctor's negligent misdiagnosis and referral, that negligent conduct was not dispositive. The court referenced the Texas Supreme Court's holding in *Mason* that a cause in fact is not established when a defendant's negligence does no more than furnish a condition that makes the injuries possible. *Id.* at 9. "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of result-

---

3. Taylor had consulted first with psychologist Dr. Carley with complaints of anxiety and problems in her marriage. *Taylor v. Carley*, 158 S.W.3d 1, 3 (Tex.App.-Houston [14th Dist] 2004, pet. denied). Carley negligently diagnosed her as having A.D.D. and advised having a psychiatrist or other medical doctor evaluate her and prescribe medication. So Taylor met with Dr. Steffek, whom Carley had recommended. *Id.* at 4. Steffek had access to Taylor's patient history from Carley, but did not rely on Carley's examination for his diagnosis. *Id.* Based on his interaction with Taylor, Steffek diagnosed Taylor with A.D.H.D., generalized anxiety disorder, and mixed personality. *Id.* Taylor completed the requested blood tests and urinalysis, but did not have the requested electrocardiogram. *Id.* Steffek subsequently told Taylor she did not need the electrocardiogram, since the results of the laboratory work were favorable. *Id.* Steffek then prescribed Adderall for Tay-

lor, writing the prescriptions in one manner, but then gave Taylor different directions for taking the medication; instructing her to gradually increase the dose, determine how she felt, and whether she had any side effects. *Id.* After many months, Taylor started experiencing headaches and weight loss and reported these symptoms to Steffek. *Id.* Steffek never checked Taylor's blood pressure while she was under his care. *Id.* at 5. According to Taylor, she saw Dr. Carley two times after she started taking the Adderall, but did not report any problems with the medication. *Id.* By the time Taylor started experiencing headaches and weight loss, she had stopped seeing Dr. Carley, explaining she did not have the time to meet with two doctors. *Id.* After some time, Taylor was hospitalized with "sudden onset of confusional state, headache, and agitation" and, due to the continued large doses of medication, suffered a stroke. *Id.*

ing injuries ... [and] justify the conclusion that such injury was the natural and probable result thereof." *Id.* (citing *Doe,* 907 S.W.2d at 477). The court stated that, as a matter of law, the first doctor was not liable because the plaintiff had not produced any summary judgment evidence showing (1) the subsequent doctor based his decision and treatment on the first doctor's diagnosis, or (2) the first doctor knew or should have known of the potential adverse consequences of the prescribed medication on the patient. *Taylor,* 158 S.W.3d at 11. "In light of [the respective doctors'] roles in the chain of events and the lack of evidence that [the second doctor's] allegedly wrongful act was a concurrent act, as opposed to a new and independent cause, [the plaintiff's] summary-judgment evidence is insufficient to raise a genuine issue of fact on the element of proximate cause." *Id.; see also Martin v. Commercial Metals Co.,* 138 S.W.3d 619 (Tex.App.-Dallas 2004, no pet.).[4]

*The Summary Judgment Evidence*

In effect, Givens alleges this chain of causation:

1. Daigle's substandard ultrasound image and inaccurate cervical measurement caused the radiologist, Gregory Godwin, to prepare and transmit to Givens' obstetrician, Robert A. Westbrook, an inaccurate or incomplete ultrasound report, which did not report Givens' unduly short cervix.

2. That report caused Westbrook to miss, or not appreciate, the risk posed by Givens' short cervix.

3. Westbrook, therefore, failed to give Givens a cervical cerclage.

4. Because Givens had no cerclage, Toni and her sibling were born prematurely.

5. Toni's premature birth created a propensity for Toni to have an extended hospitalization and to contract a congestive lung disease.

6. Toni contracted such a disease while she was hospitalized.

7. Toni's lung disease extended her hospitalization and required her to have a breathing tube.

8. Some time after Toni went home, her breathing tube occluded.

9. The breathing tube occlusion was not easily or quickly cleared.

10. Therefore, Toni was deprived of oxygen to her brain for a period of time.

11. Toni sustained serious brain damage.[5]

---

4. In *Martin,* the court held that a supplier of materials for smelting could not be held liable for the pollutants created in the smelting process. *Martin,* 138 S.W.3d 619. Martin alleged personal injuries to himself and others, purportedly caused by exposure to toxic substances released by the RSR Corporation's secondary lead smelter in Dallas. *Id.* at 622. Appellees sold scrap metal, which contained lead, to the operators of the smelter. *Id.* The smelting process generated toxic by-products. Some of those by-products were released into the nearby community in the form of soot and gas; some were buried at the site, where they leached and migrated through the soil. *Id.* The appellants urged the court to assess whether the defendants' sale of used lead products "caused and/or contributed to" the contamination of the smelter site. *Id.* at 625.

The court stressed that "contributing to" an injury is not the appropriate standard for establishing legal cause under Texas law, and that selling raw materials did not constitute the kind of control over the enterprise necessary to establish a causal connection between the supplier and the ultimate emission of toxic materials by the processor of those materials. *Id.*

5. For want of a nail the shoe was lost.
 For want of a shoe the horse was lost.
 For want of a horse the rider was lost.
 For want of a rider the battle was lost.
 For want of a battle the kingdom was lost.
 And all for the want of a horseshoe nail.
 The earliest known written version of the rhyme is in John Gower's *Confesio Amantis* dated approximately 1390.

As presented, in this case the summary judgment evidence shows that Daigle conducted an ultrasound on Givens during the course of her pregnancy. There was conflicting evidence as to whether the ultrasound was done properly, and about the quality of the result. The radiologist, Godwin, testified by deposition that he did an independent review of the films taken by Daigle, that the cervix was well visualized, that he did not rely on her measurements of the cervix in making his report, and that he did not report on the cervical length to Givens' obstetrician.

We have before us what is essentially an undisputed sequence of events, with conflict concerning whether Daigle negligently used the ultrasound machine in obtaining an image. The question is, under this state of the evidence, has Daigle conclusively proven that any such negligence was not a cause in fact of the damages alleged, or has Givens failed to present any evidence of such a causal connection.

*Application to the Damages Sought*

■ The easier attenuation issue relates to Toni's clogged tube: the link between Daigle's ultrasound and Toni's brain damage is far too attenuated to support liability. When all acts and omissions have run their course and are complete, the alleged negligence cannot actively contribute in any way to the injuries involved in this suit. *Bell*, 434 S.W.2d at 122. Here, the alleged negligence by Daigle, the ultrasound, was not the active cause of the brain damage from the clogged tube. At most, the ultrasound merely created a condition by which one or more subsequent acts of negligence could occur, and the brain damage which flowed from, or occurred after, the doctor's and home health agency's subsequent act or acts is too attenuated from Daigle's conduct for that conduct to be the cause in fact of Toni's

brain damage. *See Mason*, 143 S.W.3d at 799 (citing *Bell*, 434 S.W.2d at 122).

■ Because there are not as many intervening factors, it is not as clear that Daigle's conduct in performing the ultrasound is too attenuated from Toni's premature birth and the accompanying medical bills to support liability.

But Givens has not shown that Godwin's failure to report to Westbrook on Givens' cervix length in any way flowed from Daigle's ultrasound services. Godwin stated that he did not rely on the cervix measurements collected by Daigle and that Givens' cervix was "well visualized" in the ultrasound images. The evidence does not raise a genuine issue of material fact as to whether her acts were concurrent with any subsequent negligence, which would be necessary to avoid a conclusion that they were attenuated as a matter of law.

*Providence Health Ctr. v. Dowell* also relied on the holdings in *Mason* and *Union Pump Co.* to decipher whether a hospital could be held liable for the suicide of a recently released patient. *Providence Health Ctr. v. Dowell*, 167 S.W.3d 48 (Tex. App.-Waco 2005, no pet.). Lance Dowell was taken by Freestone County sheriff's deputies to Providence Health Center because he had self-inflicted wounds and was talking about committing suicide. *Id.* at 51. Following a physical assessment at the emergency room, Dr. James Pettit requested a psychological assessment from the DePaul Center, which is affiliated with Providence. Sister Mary Theresa Fox, a joint employee of Providence and DePaul, evaluated Lance's condition and determined he was not "actively suicidal." *Id.* Lance was discharged from the hospital and went to his mother's home in Waco. Later that day, Lance went first to Lake Limestone and then to Fairfield with his brother to a rodeo, before later visiting with friends. *Id.* On Sunday, he attended

a family reunion and made plans with his brother to meet at a party that night. On Sunday evening, Lance hung himself. *Id.*

The Waco Court of Appeals interpreted the opinions in *Mason, Union Pump,* and *Lear Siegler* as saying that a court may, as a question of law, weigh competing policy considerations and define the limits of legal causation by "fixing the line between immediate results and remote results" of wrongful acts. *Dowell,* 167 S.W.3d at 56. The court weighed the factors Providence offered as proof of attenuation: (1) Lance appeared to be perfectly normal when he was discharged; (2) no one knows precisely why he killed himself; (3) thirty-six hours passed between his discharge and suicide; (4) it is just as likely that a new and unknown event triggered his suicide; (5) a proper examination could not have guaranteed hospitalization—because Lance might not have consented to stay—and (6) hospitalization would not have guaranteed that treatment would have prevented the suicide. *Id.* "None of these factors, nor all of them together, conclusively prove that the negligence attributable to Providence was too remotely connected to Lance's suicide to constitute legal causation." *Id.* The court affirmed the trial court's assessment of negligence, including Providence's negligence. *Id.* at 51.

Daigle's factors are analogous, yet we see Daigle's actions as being significantly more attenuated: (1) Godwin did not rely on Daigle's ultrasound when issuing his report, (2) Godwin made his own assessment of the cervical length, (3) Godwin deemed the ultrasound images sufficient for his purposes, (4) other examinations occurred between the ultrasound and the birth, and (5) a review of Givens' medical records would have shown her being administered a cervical cerclage in the past. Collectively, these factors impose an impressive array of intervening factors such

that Daigle's actions were too remotely connected to Toni's premature birth.

In this case, while Daigle's alleged negligence may have contributed to the premature birth, her actions could not and did not control over the ultimate medical decisions by Givens' doctors. The evidence shows that there were other assessments and opportunities where the shortened cervix should have been discovered and dealt with. Daigle's acts, although arguably contributory, are too attenuated and remote from the premature birth to be deemed a cause in fact, and, as such, these defendants were properly granted summary judgment.

We affirm the judgment of the trial court.