

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00059-CV

_____


FRANKIE MARIE MILLER, INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF T.J. MILLER, Appellant

V.

JOHN B. MULLEN, M.D., AND TITUS REGIONAL MEDICAL CENTER, Appellees


On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 36865


Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

After suffering complications from an epidural steroid injection, T.J. Miller (T.J.) went to the emergency room where he was treated by Dr. John B. Mullen. Mullen believed that T.J. was experiencing both a heart attack and internal bleeding from the injection and prescribed aspirin in an effort to treat T.J.'s potential heart attack. After magnetic resonance imaging confirmed the presence of a hematoma, T.J. underwent emergency surgery, which left him paralyzed. Months later, T.J. became septic and died from multi-organ failure. Alleging that Mullen's administration of aspirin led to T.J.'s paralysis and death, his widow, Frankie Marie Miller (Frankie), individually and on behalf of T.J.'s estate (collectively, Miller), sued Mullen for medical malpractice.

Mullen filed no-evidence and traditional motions for summary judgment arguing that Miller presented no probative evidence that Mullen acted with willful and wanton negligence in prescribing the aspirin or that T.J.'s injuries were caused by Mullen's negligence. The trial court granted summary judgment in Mullen's favor. On appeal, Miller argues that the trial court erred in granting summary judgment because there were genuine issues of material fact on the breach and causation issues. We find that the entry of summary judgment was proper in this case and affirm the trial court's judgment.

## I.     Factual and Procedural Background

### A.     Another Doctor Gives T.J. a Cervical Injection

In the course of treating seventy-six-year-old T.J. for recurrent neck and right arm pain, Dr. Robert Sutherland prescribed a series of interlaminar cervical epidural steroid injections. On April 1, 2011, Sutherland ordered T.J. to stop his daily aspirin regimen, which thins the blood, in

2

preparation for the injections.[1]  The injections required out-patient day surgery, and T.J. was informed in writing that the risks included bleeding, numbness, paralysis, spinal fluid leak, respiratory distress, and death, among others.  T.J.'s first injection on April 8, 2011, was uneventful, but complications arose after his April 22, 2011, injection.

Following his 10:21 a.m. discharge from out-patient surgery,[2] T.J. began experiencing intense neck pain.  He returned to the day surgery department of the Titus Regional Medical Center and asked a nurse if he could speak to Sutherland.  The nurse took T.J. straight to the emergency room (E.R.), where he was met by another nurse, Stormy Hill, and Mullen, a board-certified neurosurgeon and E.R. doctor.

### B.    Mullen Treats T.J. in the E.R. for Complications After the Injection

Hill's notes stated that T.J. arrived in the E.R. at 11:05 a.m. "with complaints of severe back/neck pain starting after [the] patient had [a] pain injection."  Hill further noted, "Patient presents very pale and clammy with complaints of severe pain in chest that radiated to back.  Patient unsootheable.  Dr. Mullen at bedside."  T.J.'s E.R. records confirmed that he complained of chest and neck pain and that he was experiencing motor difficulties in his right leg.  Mullen "knew that [T.J.] had a spinal epidural injection," was suspicious that T.J. was having a sleep onset myoclonic jerk in his leg, and immediately knew that the symptom could be the result of cervical cord compression from a hematoma caused by the injection.  However, Mullen explained that he "was concerned [T.J.] was having a heart attack" because he "came in complaining of severe chest

---

[1]T.J's medical history included hypertension, diabetes, and kidney disease.

[2]The discharge notes reflect that T.J. was not in any pain at the time of his discharge.

pain as well as neck pain. He was cold and clammy, grabbing his chest, saying he was going to die." Mullen immediately ordered a "cardiac chain" that included an electrocardiogram (EKG), several other tests, and analysis of bloodwork. He testified that he believed T.J. was suffering from two separate issues—a heart attack and a hematoma—at the same time.

At 11:07, two minutes after the cardiac chain was ordered, an EKG reflected that T.J. was not then suffering any significant cardiac problem. To rule out the possibility that T.J. had recently suffered a heart attack, T.J.'s blood was drawn at 11:10 a.m. and was received in the hospital's laboratory at 11:20 a.m. At 11:15 a.m., before T.J.'s blood work was returned, Hill gave him 325 milligrams of chewable baby aspirin on Mullen's orders. Mullen testified that he knew that aspirin delayed the clotting mechanism in the blood and acted as a blood thinner even in low doses, but ordered the aspirin as "standing protocol" for a patient showing symptoms of cardiac distress. As a part of the cardiac chain, Mullen ordered a prothrombin time and international normalized ratio study (PT/INR) to determine the "clotting status of the patient." A portable chest x-ray was completed at 11:22 a.m. and showed no abnormality.

At 11:27 a.m., Mullen ordered a magnetic resonance image (MRI) of the cervical spine. Shortly thereafter, the analysis of T.J.'s blood work was returned from the laboratory. The PT/INR test showed that T.J.'s blood was coagulating normally. Mullen testified that the blood work demonstrated that T.J. was not having a heart attack.

Although the MRI was ordered at 11:27, T.J. was in such pain that he could not sit still for the MRI until he was further medicated. The MRI was completed at approximately 12:45 p.m., revealed a hematoma that was approximately one-foot long and a "probable air artifact in the

4

posterior spinal canal at the T3 and T4 level that likely represent[ed] air bubbles related to recent injection." Mullen diagnosed T.J. with "hematoma complicating a procedure," concluded that T.J. needed immediate surgical intervention to relieve the pressure on T.J.'s spinal cord to prevent paralysis, and spoke with Dr. Bradley Duhon, a neurosurgeon at East Texas Medical Center, who agreed to operate on T.J.

### C. Another Doctor Performs Emergency Surgery

Duhon performed an emergency laminectomy to depress T.J.'s spinal cord. The first operation lasted from 4:08 p.m. until 9:00 p.m. A follow-up MRI revealed that T.J. still had an epidural hematoma, causing Duhon to perform a second laminectomy.

After his surgeries, T.J. lost motor function in his legs. He spent the next five days in the hospital, was discharged to an in-patient rehabilitation facility, and underwent approximately six months of physical rehabilitation at several in-patient rehabilitation centers. Subsequently, T.J. suffered a tear in his rotator cuff, which required surgery in September 2012. While in a medical facility, T.J. developed pneumonia and sepsis. He died in October 2012.

### D. Miller Sues Mullen and Obtains Expert Report

Miller sued Mullen for medical malpractice and obtained the expert report of Dr. James Michael Vascik, a board-certified neurosurgeon.[3] Vascik noted that post-operative hematoma is one of the possible complications that can arise from an epidural steroid injection. According to Vascik, Mullen's administration of aspirin, "a known antiplatelet medication," was "outside of

---

[3]Vascik's report stated that he orders epidural steroid injections and treats patients "prior to and after those injections are placed," both in and out of the emergency room.

[the] acceptable standard of care" given T.J.'s "history of an epidural steroid injection having been given and the history of arm weakness and pain, and the presence of an epidural hematoma." Vascik explained that the aspirin prevented the normal human clotting mechanism which could have stopped the active bleeding in this case.

Vascik went on to state, "Had the aspirin not been administered, it is reasonably medically probable that the blood clot would not have continued to increase in size, and the operative surgeon would not have had difficulty in controlling the bleeding." He opined that Mullen "took extreme risk by ordering aspirin for Mr. Miller" because there was "[n]o justification . . . for this order in light of the normal EKG." Vascik also stated, "It is entirely likely that had the patient not had the epidural hematoma that led to his becoming paralyzed, he would not have injured his shoulder, would not have had the surgery that led to his pneumonia, which then led to sepsis and his death."[4]

### E.    Miller's Expert Testifies

During his deposition, Vascik opined that, "when the steroid injection was placed, an artery/arteriole was nicked," and clarified that his only criticism of Mullen was his administration of the aspirin in light of the normal EKG. He stated that aspirin is avoided prior to cervical injections due to its antiplatelet effect, that the antiplatelet effect is realized in a matter of minutes, and that it is foreseeable that aspirin taken within a few hours after a procedure can cause a bleeding complication. Vascik believed that the aspirin caused T.J.'s injuries because (1) the PT/INR demonstrated that T.J.'s blood was clotting normally, which indicated that the bleeding could have

---

[4]In an amended report, Vascik clarified, "Although the specific blood test indicating Mr. Miller's coagulation status, the PTT, was within normal limits, the administration of aspirin, a known platelet blocking agent, led to the difficulty with this surgeon's evacuating and stopping the bleeding and in all medical probability increasing the size of this clot."

6

stopped in the absence of the administration of aspirin, (2) T.J. developed signs of weakness that were not persistent prior to the administration of aspirin, (3) "[T.J.] was not paralyzed before the administration of the aspirin," and (4) Duhon noted that he had a great deal of difficulty getting T.J.'s blood to clot during surgery.

Vascik could not agree that T.J. would have had the exact same outcome even without the aspirin because "[i]t did not allow for thrombus to develop that may have stopped the bleeding short of the development of paralysis in short of the development of the size of the clot that would require surgery." Vascik testified, "[I]t is my opinion that but for the inhibition of the clotting mechanism, this aspirin, I believe it is more likely than not that he would not have been paralyzed" and also concluded that the administration of aspirin was the proximate cause of T.J.'s death. In an attempt to establish the causal nexus, Vascik explained that the epidural hematoma caused spinal cord damage, which caused T.J's legs not to function, which led to overuse of his shoulder, which caused rotator cuff damage that required surgery, which required him to be in an in-patient facility, which provided the environment for T.J. to develop pneumonia, which led to sepsis, multi-organ failure, and death. In sum, Vascik stated that, "more likely than not, if he wasn't paralyzed and he was moving around normally, he would not have the risk of pneumonia and would not have died when he did."

However, Vascik agreed that T.J.'s medical history indicated that he was at risk of having a heart attack, that his condition in the emergency room led to a reasonable differential diagnosis of a life-threatening heart attack, and that Mullen's opinion that T.J. was also suffering a heart attack was reasonable. Vascik explained, "You get an old guy that is hypertensive, diabetic, you

7

put stress on him. An epidural steroid injection usually goes very smoothly and you can go out and have dinner afterward, but in some people it can increase your level of stress and potentially put more stress on your heart and can lead to a heart attack." Vascik testified that he had no doubt that Mullen believed T.J. was having a heart attack, that aspirin therapy confers conclusive net benefits in the acute phase of evolving myocardial infarction and should be administered routinely to virtually all patients with evolving acute myocardial infarctions, and that a normal EKG does not rule out myocardial infarction. Vascik also agreed that there was no evidence to suggest that Mullen was consciously aware of but indifferent to T.J.'s risk of paralysis.

Vascik explained that hematoma and paralysis are risks of the injections, that a hematoma cannot be diagnosed without an MRI, and that surgery is the only option when a hematoma is found. Because he did not know what the hematoma looked like prior to the administration of the aspirin, Vascik did not know whether T.J. would have had the same outcome even if the aspirin had not been administered and could not say how much damage was directly attributable to the medication.[5] Vascik further acknowledged that there are hematoma patients who suffer paralysis as a result of the injections without ingesting aspirin and that he had never had a patient suffer paralysis as a result of ingesting aspirin because he could control the bleeding during surgery by "giv[ing] a ten-pack of platelets as an administrative tool." Vascik testified that aspirin's platelet inhibition lasts approximately six or seven hours and that T.J. received two six-packs of platelets during his surgery.

---

[5]Vascik could not cite to any medical literature that would indicate how much worse T.J.'s condition became as a result of the aspirin.

### F. The Trial Court Grants Summary Judgment

After ample time for discovery had passed, Mullen filed no-evidence and traditional motions for summary judgment arguing that Miller had no evidence that he breached the emergency room standard of care or caused T.J.'s damages. After reviewing T.J.'s medical records, and Mullen and Vascik's depositions, the trial court granted summary judgment in Mullen's favor.

## II. Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). "When a party moves for summary judgment on both no-evidence and traditional grounds, the appellate court should ordinarily address the no-evidence grounds first." *Burleson v. Lawson*, No. 11-14-00004-CV, 2016 WL 687213, at *2 (Tex. App.—Eastland Feb. 18, 2016, no pet.) (mem. op.) (citing *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013)).

"To prevail on a no-evidence motion for summary judgment, the movant must first allege that there is no evidence of one or more specified elements of a claim or defense on which the non-movant would have the burden of proof at trial." *Crocker v. Babcock*, 448 S.W.3d 159, 163 (Tex. App.—Texarkana 2014, pet. denied). "A no-evidence summary judgment is essentially a pretrial directed verdict." *Virginia Oak Venture, LLC v. Fought*, 448 S.W.3d 179, 185 (Tex. App.—Texarkana 2014, no pet.). "Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *Id.* (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). "We must determine whether

the plaintiff produced any evidence of probative force to raise a fact issue on the material questions presented." *Id.* During our analysis, "we review the evidence in the light most favorable to the non-movant, credit evidence favorable to that party if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Sage v. Howard*, 465 S.W.3d 398, 402 (Tex. App.—El Paso 2015, no pet.) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

"The plaintiff will defeat a defendant's no-evidence summary judgment motion if [the] plaintiff presented more than a scintilla of probative evidence on each element of its claim." *Fought*, 448 S.W.3d at 185 (citing *King Ranch*, 118 S.W.3d at 751; *Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 657 (Tex. App.—Texarkana 2013, no pet.)). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Crocker*, 448 S.W.3d at 163 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Id.* (quoting *King Ranch, Inc.*, 118 S.W.3d at 751).

## III.    Analysis

In a medical negligence cause of action, the plaintiff must prove "(1) a duty by the physician to act according to a certain standard, (2) breach of the applicable standard of care, (3) an injury, and (4) a sufficient causal connection between the breach of the standard and the injury." *Benish v. Grottie*, 281 S.W.3d 184, 191 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Duff v.*

*Yelin*, 751 S.W.2d 175, 176 (Tex. 1988)). Proof of the standard of care in this case is governed by

Section 74.153 of the Texas Civil Practice and Remedies Code, which provides,

> In a suit involving a health care liability claim against a physician or health care provider for injury to or death of a patient arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, the claimant bringing the suit may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.153 (West Supp. 2015).

## A. There Was No Evidence of the Subjective Element of Wilful and Wanton Neglect

"[T]he standard of proof imposed by section 74.153 requires proof . . . that the physician or health care provider's mental state or intent at the time of any deviation from the medical standard of care was wilful and wanton."[6] *Benish*, 281 S.W.3d at 191. This wilful and wanton standard is synonymous with gross negligence.[7] *Turner v. Franklin*, 325 S.W.3d 771, 781 (Tex. App.—Dallas 2010, pets. denied); *see Dunlap v. Young*, 187 S.W.3d 828, 836 (Tex. App.—

---

[6]"The Texas Supreme Court has explained repeatedly that it is a tortfeasor's intent or mental state that distinguishes between negligence, gross negligence, knowing acts or omissions, wilful negligence, and intentional conduct." *Bernish*, 281 S.W.3d at 191 (citing *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164 (Tex. 2005); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004)).

[7]In this Court and in the trial court, both parties represented that *Turner* is correct in its discussion of the willful and wanton standard. For purposes of analyzing this summary judgment, we assume the *Turner* definition of the willful and wanton standard, as urged by both parties.

11

Texarkana 2006, no pet.) (citing *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 50 n.25 (Tex. App.—Houston [1st Dist.] 1993, writ denied)).

"Gross negligence, in turn, is comprised of two elements—one objective and one subjective." *Turner*, 325 S.W.3d at 781; *see Burleson*, 2016 WL 687213, at \*7. "Circumstantial evidence is sufficient to prove either element of gross negligence." *Turner*, 325 S.W.3d at 781. "For the objective element, 'the act or omission must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others.'" *Burleson*, 2016 WL 687213, at \*7 (quoting *Turner*, 325 S.W.3d at 781). "To meet this element, Dr. [Mullen]'s conduct must involve the 'likelihood of serious injury' to [T.J.]." *Id*. "For the subjective element, [Mullen] must have 'actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others.'" *Id*. (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008)). "[T]he plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Turner*, 325 S.W.3d at 782.

Although "issues of intent are usually best left to the trier of fact to resolve," "there is nothing about the willful and wanton negligence standard in Section 74.153 that categorically precludes it from resolution by summary judgment." *Id.* at 782–83. Here, Miller had the burden to produce more than a scintilla of evidence that Mullen met both the objective and subjective elements of gross negligence to defeat his summary judgment, but only the subjective element is challenged. *Id.*

12

"Evidence of 'some care' will not disprove gross negligence as a matter of law," but "intent to harm is not required to prove a defendant acted with willful and wanton negligence." *Id*. at 784. Instead, "[c]ourts must look for 'evidence of the defendant's subjective mental state rather than the defendant's exercise of care,'" *Id*. (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 20 (Tex. 1994)), to determine if "the defendant was subjectively aware of the risk involved and chose to proceed in conscious indifference of the rights, welfare, and safety of others," *Id*. (citing *Hogue*, 271 S.W.3d at 248).

Miller argues that Mullen's administration of the aspirin after the normal EKG presented an extreme risk of serious injury to T.J. She further argues that Mullen's testimony established that he was aware of the risk because he believed that T.J. could be experiencing a hematoma, knew that paralysis could result, and knew that aspirin was an antiplatelet medication, which could prevent the natural clotting mechanism of T.J.'s blood.

Mullen argues that, while he was aware of the risk and chose to proceed, there was no evidence that the administration of the aspirin was due to his conscious indifference to T.J.'s welfare or safety. We agree.

Mullen believed that T.J. was suffering from a heart attack, and Vascik agreed that Mullen's opinion was reasonable. While Vascik faulted Mullen for administering the aspirin after the EKG results, he also stated that a normal EKG does not rule out heart attack, but only establishes that the patient is not currently suffering a heart attack.[8] Although Vascik's testimony

---

[8]Vascik testified,

> Once you have a normal EKG, . . . [t]here are times where you won't see ST elevation, you pretty much have ruled out a lot of people as having heart attacks, so then you should hold off on the

13

presented a fact question on the objective component of willful and wanton negligence, Mullen's testimony spoke directly to his subjective mental state at the time that the aspirin was administered.

Because Mullen was awaiting other results that would indicate whether T.J. had recently suffered a heart attack, he decided to administer the aspirin which was a part of the standard heart attack prevention protocol. Thus, Mullen's testimony establishes that he gave T.J. aspirin in spite of the risk of doing so in light of the differential diagnosis because T.J. was "clutching his chest and stating he had chest pain and neck pain. He was sweaty and diaphoretic. His skin was clammy and pale. These are all symptoms of potential heart attack." In speaking to the subjective component, Vascik testified that there was no evidence to suggest that Mullen was indifferent to T.J.'s risk of paralysis.

Therefore, even when viewing the evidence in the light most favorable to Miller, we find that Miller failed to bring forth more than a scintilla of probative evidence showing that Mullen was consciously indifferent to T.J.'s safety or welfare when making his decision to administer aspirin. *See Christus Health S.E. Tex. v. Licatino*, 352 S.W.3d 556, 563 (Tex. App.—Beaumont 2011, no pet.). Accordingly, the trial court's summary judgment was proper.

### A. There Was No Evidence that T.J.'s Injuries Were Caused by Aspirin

We further find that there was no evidence that T.J.'s injuries were caused by Mullen's administration of aspirin. "To establish causation in a medical malpractice case, the plaintiff is required to show evidence of a 'reasonable medical probability' or 'reasonable probability' that

---

aspirin and look at and develop your other differential diagnosis. . . . Knowing that the EKG was normal in a patient you are concerned with a heart attack doesn't absolutely clear that he had a heart attack, but it gives you enough freedom to wait and work on your second diagnosis.

14

his injuries were proximately caused by the negligence of one or more defendants." *Sage v. Howard*, 465 S.W.3d 398, 403 (Tex. App.—El Paso 2015, no pet.) (citing *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995)). "Proximate cause consists of both cause in fact and foreseeability." *Givens v. M&S Imaging Partners, L.P.*, 200 S.W.3d 735, 738 (Tex. App.—Texarkana 2006, no pet.); *see Rodriguez–Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013).

"Cause in fact is established when an act or omission was a substantial factor in bringing about the harm, and, without it, the harm would not have occurred." *Id.*; *see Milo*, 909 S.W.2d at 511. "Cause in fact is not established where a defendant's negligence does no more than furnish a condition which makes the injuries possible." *Givens*, 200 S.W.3d at 738. "In other words, such conduct of a defendant is considered to be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm."[9] *Id.*

Vascik could not agree that T.J. would have had the same outcome had the aspirin not been given because T.J.'s blood was clotting normally prior to the administration of the aspirin, which meant that it was "also likely that he would have stopped bleeding on his own at some point." Vascik testified that the aspirin inhibited the clotting mechanism, which could have exacerbated the size of the hematoma and led to Duhon's difficulty in controlling the bleed. Vascik concluded, "[B]ut for . . . this aspirin, . . . it is more likely than not that [T.J.] would not have been paralyzed." Vascik based his opinion on "the knowledge that within 15 or 20 or 30 minutes after the administration of the aspirin is when [T.J.] started having the weakness in the legs," which lead

---

[9]On appeal, Miller does not specifically argue that there was evidence that the administration of aspirin caused T.J.'s death. The appellate brief focuses on the "prolonged bleeding" and "paralysis."

15

Vascik to believe "that the bleeding either became more active or reached a critical mass and compressed the spinal cord."

At first blush, it appears that this testimony was sufficient to raise a fact issue on causation. Yet, "proof that a patient lost *some* chance of avoiding a medical condition . . . is not enough." *Id.* at 861. Further, a "20/20 hindsight analysis which does not provide . . . any evidence of causation" is insufficient. *See Moreno v. M.V.*, 169 S.W.3d 416, 422 (Tex. App.—El Paso 2005, no pet.).

Vascik testified that the hematoma was caused by Sutherland's injection and that permanent damage from hematoma can result within ten minutes. The following transcript from Vascik's deposition established that his opinions were based on speculation and possibility:

> Q      But we really don't know, do we, sir? I mean the fact of the matter was he was bleeding for some two hours before he presented to the emergency department. He had ten out of ten pain. . . . There is no question he was going to have to be transferred to a higher level facility.
>
> A      I agree.
>
> Q      And there are patients that have this exact same complication without aspirin onboard that end up paralyzed, true?
>
> A      Absolutely.
>
> Q      So there is no way to sit here in hindsight and say but for that aspirin, Mr. Miller would not have this result because it can and does occur even without aspirin, doesn't it ?
>
> A      You are not asking a generality. You are asking about him. And in this case he was not paralyzed before the administration of the aspirin. We don't have an MRI scan before the administration of aspirin. You are asking me to make an assumption that I can't make.
>
> Q      Right. And that's my point, is that you can't make that assumption. You can't say one way or the other whether or not Mr. Miller would have been

16

paralyzed but for the aspirin because there are patients that suffer the same complication as a result of epidural steroid injection without aspirin onboard.

. . . .

A       But your specific question to me asked me to agree with you that he would have had the same complication without aspirin and I disagree. I don't know that.

Q       Fair enough. You don't know that. So I guess that's really the answer, is that we don't know -- would you agree, we don't know one way or the other whether or not Mr. Miller would have had the same outcome regardless of the aspirin?

A       Fair enough.

Q       In other words, we can't say within a reasonable medical probability that the same sequela wouldn't have occurred even without the aspirin, true?

. . . .

A       Correct.

Q       Can you cite or direct me to any literature that tells me how much worse Mr. Miller's condition became as a result of the aspirin?

A       Of course not.

Vascik also testified that he had never had a patient suffer a paralysis as a result of ingesting aspirin because he could control the bleeding during surgery by, as Duhon did in this case, "giv[ing] a ten-pack of platelets as an administrative tool."

"The plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury." *Thomas v. Farris*, 175 S.W.3d 896, 899 (Tex. App.—Texarkana 2005, pet. denied). "While expert medical testimony concerning the possible causes of the condition in question is admissible to assist the trier of fact

17

in evaluating other evidence in the case, a possible cause only becomes probable when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." *Id.* "Even if an expert uses the phrase "reasonable probability," the evidence is not sufficient when the substance of the expert testimony raised only mere possibilities, speculation, and surmise." *Id*. at 900; *see Hogue*, 271 S.W.3d at 247.

Here, we find that Vascik's testimony established that the administration of the aspirin was a possible cause of T.J.'s injuries, but fell short of raising a fact issue as to whether the aspirin was a probable cause of his paralysis or death. Accordingly, the trial court properly granted the no-evidence motion for summary judgment on the issue of causation.

## IV. Conclusion

We affirm the trial court's judgment.


Ralph K. Burgess
Justice


Date Submitted:     February 23, 2016
Date Decided:       June 24, 2016

18