

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-18-00040-CV

———————————————————

TAMISHA NICOLE CAMPBELL, INDIVIDUALLY AND AS GUARDIAN AND
NEXT FRIEND OF TAMATHA NANETTE WILLIAMS, AN INCAPACITATED
PERSON, Appellant

V.

PAUL H. POMPA, M.D. AND MARCUS LESLY WEATHERALL, M.D.,
Appellees

---

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-275904-14

---

Before Gabriel, Birdwell, and Bassel, JJ.
Opinion by Justice Birdwell
Concurring and Dissenting Opinion by Justice Gabriel

**OPINION**

Tamisha Campbell filed health care liability claims against Dr. Paul Pompa and Dr. Marcus Weatherall, who rendered care to her mother, Tamatha Williams, shortly before she sustained severe brain injuries. The jury rendered a verdict in favor of the defendants. In her first two issues, Campbell contends that the great weight of the evidence shows that Dr. Pompa did not render emergency medical care to Tamatha, and even if he did, Dr. Pompa and Dr. Weatherall acted with gross negligence sufficient to satisfy the heightened burden of proof that applies to certain emergency medical care. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.153. We conclude that the jury's findings to the contrary were supported by factually sufficient evidence.

In her third issue, Campbell challenges the composition of her venire panel, arguing that the use of an electronic jury summons system resulted in a venire that was disproportionately Caucasian, affluent, educated, and young. We hold that Campbell's claim should be moored to and judged under the standards articulated in *Duren v. Missouri*.[1] Because Campbell introduced no evidence to satisfy *Duren's* elements, we conclude that the trial court properly ruled against her challenge.

Campbell failed to preserve her fourth and final issue regarding the admission of evidence. Accordingly, we affirm.

---

[1] 439 U.S. 357, 99 S. Ct. 664 (1979).

## I.    Background

### A.    December 10

On Monday, December 10, 2012, Tamatha went to the TotalCare Clinic in Fort Worth, complaining of trouble swallowing, trouble breathing, and "severe" throat pain starting the day before, which she rated at ten out of ten. She was diagnosed with swelling in the head and neck. The doctor treated her with steroids and recommended that she go to the emergency room immediately, and the medical records show that Tamatha agreed to go "now." Tamatha instead went home to rest and then returned to her job as a bus driver that afternoon.

### B.    December 11

On the morning of December 11, 2012, Tamatha reported to work early. After finishing her morning shift, Tamatha went to the emergency room at Texas Health Harris Methodist Hospital Southwest Fort Worth ("Texas Health Southwest") at 9:16 a.m.

At 9:20 a.m., nurse Kimberly Harbold triaged Tamatha. Among her symptoms, Tamatha reported chest pain. Tamatha described her pain as ten out of ten, which Harbold explained to patients meant "the worst [pain] you've ever experienced in your life." Harbold ordered an EKG to rule out heart problems. The EKG revealed an abnormality not associated with acute coronary issues. Harbold triaged her as a level three out of five, which was defined as "urgent."

Dr. Paul Pompa saw Tamatha at 10:09 a.m. He documented symptoms including chest tightness, sore throat, high blood pressure, difficulty swallowing, and tenderness—but significantly, he did not observe any swelling. Within his differential diagnosis, he considered an array of possible diagnoses, including heart attack. However, he ruled out many of these possibilities based on testing and evaluation. He was soon convinced that Tamatha's situation did not present an emergency or anything warranting admission to the hospital. At 10:19 a.m., he determined that her symptoms best fit the diagnoses of upper respiratory infection, chest wall inflammation, ear infection, and hypertension. At 10:23 a.m., he informed Tamatha of his diagnosis and told her that she was being discharged from the emergency room with medications.

During the discharge process, Tamatha was assessed by a nurse, who documented additional symptoms. Like Dr. Pompa, though, she did not observe any swelling. Tamatha was discharged shortly after 11:00 a.m.

## C.     December 12

When Tamatha woke the next morning, her face, tongue, and neck were swollen to the point that it was difficult to breathe. She returned to Texas Health Southwest's emergency department at 5:45 a.m. She was seen by Dr. Marcus Weatherall, who immediately recognized it as a dire situation and knew she was at high risk of losing her airway due to the swelling. The hospital tested and treated her for possible allergic and infectious reactions, to no avail. Dr. Weatherall determined that Tamatha might have to be intubated, so he ordered sedatives around 6:15 a.m.

4

Recognizing that intubation might be difficult, Dr. Weatherall contacted Dr. Jones, an anesthesiologist experienced in airway management. Dr. Jones in turn recommended that an ear, nose, and throat specialist or a trauma surgeon be present during intubation in case there was a need to surgically establish an airway through the neck. No specialist or trauma surgeon was available, so it was decided that the next best option was the general surgeon on call, Dr. Domingo Tan. At 6:19 a.m., staff contacted Dr. Tan, who began to drive in from his home thirty minutes away. Tamatha was transferred to the operating room to await Dr. Tan's arrival. At this point, Tamatha was barely able to gasp one-word answers to the staff's questions, though her oxygen levels were still within normal limits. His shift about to end, Dr. Jones briefed a new anesthesiologist on the case, though Dr. Weatherall was unaware of this.

At 6:38 a.m., Tamatha went into respiratory distress, and hospital staff began anesthesia to prepare for intubation. At about 6:45 a.m., Dr. Tan was still not at the hospital, so staff contacted the only surgeon on call, Dr. Darren Chapman, a urologist who had never performed a surgical airway procedure. When Dr. Chapman was called into the operating room, he began reading the directions to the surgical airway kit while the anesthesiologist attempted to intubate Tamatha. After five minutes of reading, Dr. Chapman was interrupted by the anesthesiologist, who told him that he needed to begin the surgical airway procedure immediately. Tamatha's airway had shut, and she was no longer breathing. Dr. Chapman made an incision, and as he attempted to thread a guide-wire into Tamatha's trachea, she went into cardiac arrest. Chest compressions

were started, and Dr. Chapman made a second attempt to thread the wire. The wire went through and came out of Tamatha's mouth. The anesthesiologist used the wire to intubate Tamatha without a surgical airway.

By the time her airway and heart rhythm were restored, Tamatha had sustained irreversible brain injuries due to lack of oxygen, leaving her in a vegetative state. Dr. Tan arrived around 7:00 a.m. and closed the wounds to Tamatha's neck caused by the attempted surgical airway.

## D. Campbell Files Suit

Campbell filed health care liability claims individually and as guardian and next friend of her mother. Named as defendants were TotalCare, Dr. Pompa, Dr. Weatherall, and other parties not at issue in this appeal. Before trial, Campbell nonsuited her claims against TotalCare and filed a motion in limine seeking to prevent disclosure of her former TotalCare claims. The trial court denied the motion.

The case was tried before a jury in September 2017. At trial, Campbell theorized that Tamatha had suffered from angioedema, a leaking of the blood vessels which causes swelling in the face and neck. Campbell argued that Dr. Pompa was liable for misdiagnosing Tamatha's condition on December 11 and that Dr. Weatherall was liable for mistreating her condition on December 12.

The jury found that Dr. Pompa rendered "emergency medical care" on December 11, triggering a heightened burden of proof that required Campbell to show that he acted with "wilful and wanton negligence." *See id.* Campbell did not dispute

6

that Dr. Weatherall rendered emergency medical care on December 12. The jury found that neither doctor acted with wilful and wanton negligence. Accordingly, the trial court rendered a take-nothing judgment against Campbell. She appeals.

## II.    Emergency Medical Care

In her first issue, Campbell contests the jury's finding that Dr. Pompa rendered emergency medical care. She asserts that the heightened burden of proof provided by section 74.153 is an affirmative defense which Dr. Pompa waived by failing to specifically plead it in his answer.

In the alternative, Campbell argues that the jury's finding that Dr. Pompa rendered emergency medical care is not supported by factually sufficient evidence. She asserts that the overwhelming weight of the contrary evidence—including Dr. Pompa's admission that he did not consider Tamatha's situation to be an emergency—should compel the conclusion that Dr. Pompa did not render emergency medical care under the meaning of the statute.

## A.    General Applicable Law

Section 74.153 governs health care liability claims for injuries or death arising out of the "provision of 'emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department.'" *Burleson v. Lawson*, 487 S.W.3d 312, 317 (Tex. App.—Eastland 2016, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.153). When it applies, the statute provides that the claimant

7

may prove that the treatment or lack of treatment by the physician or health care provider departed from accepted standards of medical care or health care only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem. Code Ann. § 74.153. These statutory provisions do not change the standard of care for an emergency room health care provider, but they heighten the burden of proof required by the claimant. *Benish v. Grottie*, 281 S.W.3d 184, 191 (Tex. App.—Fort Worth 2009, pet. denied). The wilful and wanton standard of section 74.153 is coextensive with the gross negligence standard. *Martinez-Gonzalez v. EC Lewisville, LLC*, No. 02-17-00122-CV, 2018 WL 1192242, at *6 (Tex. App.—Fort Worth Mar. 8, 2018, pet. filed) (mem. op.); *Miller v. Mullen*, 531 S.W.3d 771, 779 (Tex. App.—Texarkana 2016, no pet.); *Sage v. Howard*, 465 S.W.3d 398, 407 (Tex. App.—El Paso 2015, no pet.).

**B.     Waiver**

As an initial matter, Campbell asserts that the protection of section 74.153 is an affirmative defense and that Dr. Pompa waived this defense by failing to specifically plead it. Campbell asserts that because this defense was waived under rule 94, the trial court erred in submitting that theory for the jury's resolution. *See* Tex. R. Civ. P. 94.

In response, Dr. Pompa asserts that chapter 74.153 does not establish an affirmative defense. Rather, he asserts that this provision merely defines the standard

8

of proof in cases involving medical emergencies, and he was therefore not required to plead it under rule 94.

The Texas Rules of Civil Procedure require that any matter constituting an avoidance or affirmative defense be set forth affirmatively in a responsive pleading. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155 (Tex. 2015) (quoting Tex. R. Civ. P. 94). If an affirmative defense or avoidance is not expressly pleaded, the party cannot rely on the defense as a bar to liability. *Id.*

Because "avoidance" and "affirmative defense" are closely related terms, courts frequently use the terms interchangeably. *Id.* at 156. An "affirmative defense" is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true. *Godoy v. Wells Fargo Bank, NA*, 575 S.W.3d 531, 536 (Tex. 2019). Similarly, an avoidance defense admits the plaintiff's cause of action but asserts the existence of other facts which justify or excuse it. *Zorrilla*, 469 S.W.3d at 156. Neither category of defense operates by "tend[ing] to rebut the factual propositions asserted in the plaintiff's case." *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991) (op. on reh'g); *see MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014). Rather, both categories of defenses seek to establish some "independent reason why the plaintiff should not recover." *See Zorrilla*, 469 S.W.3d at 156; *Genesis Tax Loan Servs., Inc. v. Kothmann*, 339 S.W.3d 104, 108 (Tex. 2011); *Gorman*, 811 S.W.2d at 546. Both categories of defenses

place the burden of proof on the defendant to present sufficient evidence to establish the defense and obtain the requisite jury findings. *Zorrilla*, 469 S.W.3d at 156.

With that framework in mind, we proceed to determine whether section 74.153 gives rise to an affirmative defense. Campbell asserts that another provision of chapter 74 should lead us to conclude that section 74.153 creates an affirmative defense. She notes that section 74.153 is an outgrowth of the Good Samaritan statute, a related provision found in section 74.151, which states as follows: "A person who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 74.151(a). Courts have recognized that the Good Samaritan statute provides an affirmative defense against ordinary negligence for persons who administer emergency care under specified circumstances. *McIntyre v. Ramirez*, 109 S.W.3d 741, 742 (Tex. 2003). Campbell asserts that because section 74.153 shares a common origin and roughly analogous content with the Good Samaritan statute, we should likewise conclude that section 74.153 creates an affirmative defense.

We agree that section 74.153 shares a common legislative origin and at least some content with the Good Samaritan law. But legislative history does not control the meaning of an unambiguous statute. *Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 136 (Tex. 2018). Rather, it is the statute's plain text that properly guides our interpretation. *Id.*

10

In drafting section 74.153, the Legislature carved a linguistic path that differs in important respects from the Good Samaritan statute. Unlike section 74.153, the Good Samaritan statute creates an immunity, a set of facts which the defendant may prove to show that it is "not liable in civil damages." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.151(a); *McIntyre*, 109 S.W.3d at 744. The Good Samaritan statute is comparable to other immunity statutes that have been found to create affirmative defenses. *See Lippert v. Eldridge*, No. 03-15-00643-CV, 2016 WL 6068260, at *3 (Tex. App.—Austin Oct. 12, 2016, no pet.) (mem. op. on reh'g) (concluding that a volunteer immunity statute— which provides that if certain facts are shown, "no volunteer of a nonprofit organization or governmental entity shall be liable for harm" unless committed with gross negligence or worse—creates an affirmative defense); *Doyal v. Tex. Dep't of Criminal Justice-Institutional Div.*, 276 S.W.3d 530, 536–37 (Tex. App.—Waco 2008, no pet.) (noting that government code section 497.096 creates an affirmative defense in that if certain facts are shown, a defendant is "not liable for damages" unless its wrong was intentional, wilful and wanton, or grossly negligent). The plain language of the Good Samaritan statute, then, is properly construed as putting the burden on the defendant to show an independent reason why the plaintiff may not recover. *See Genesis Tax*, 339 S.W.3d at 108.

By contrast, section 74.153 deals with what a *plaintiff* must prove in order to prevail in certain types of health care liability claims. The statute provides that the claimant "may prove" a deviation from the standard of care only if the claimant

demonstrates wilful and wanton negligence. Addressing an analogous provision, the court in *Priddy v. Rawson* rejected the view that the nonprofit corporation statute created an affirmative defense where it provided that a person seeking to establish liability of a director "must prove" certain facts. 282 S.W.3d 588, 594 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing a former version of Tex. Bus. Orgs. Code Ann. § 22.221(b)). Like the statute in *Priddy*, section 74.153 deals solely with what the claimant is required to prove in order to establish liability, and the statutory language thus "makes clear that the party seeking to impose liability . . . bears the burden of proof." *See id.* As such, section 74.153 "is not an independent reason to deny recovery; it goes to the heart of the plaintiff's case." *See Genesis Tax*, 339 S.W.3d at 108.

We conclude that section 74.153 does not create an affirmative defense. Appellees were therefore not required to plead that theory in order to submit it for the jury's resolution.[2]

Moreover, even assuming that Dr. Pompa was generally required to plead the applicability of that section, Campbell waived any objection to Dr. Pompa's failure to do so. At no point did Campbell object to the absence of such pleadings in the trial court. Before trial, Campbell did not file special exceptions concerning Dr. Pompa's failure to plead emergency medical care. *See* Tex. R. Civ. P. 90. Just the opposite,

---

[2]*See* Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges: Malpractice, PJC 51.18C & cmt. (2018) (suggesting that jury should be charged on emergency medical care when raised by the evidence).

Campbell raised the issue of emergency care herself, pleading that Dr. Pompa did not render emergency medical care that would trigger section 74.153. During trial, both parties introduced evidence and argument concerning whether Dr. Pompa rendered care under emergency circumstances, and if so, whether his actions were wilful and wanton, implying that both parties understood this issue was being tried by consent. When issues not raised by the pleadings are tried by implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings. *Denton Cty. Elec. Co-op., Inc. v. Hackett*, 368 S.W.3d 765, 773 (Tex. App.—Fort Worth 2012, pet. denied) (citing Tex. R. Civ. P. 67); *see Godoy*, 575 S.W.3d at 537 (applying this rule to an unpleaded affirmative defense); *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) (similar). And perhaps most importantly, Dr. Pompa sought and obtained a jury charge on section 74.153, with specific questions concerning emergency medical care and wilful and wanton negligence. Campbell did not object to the charge in this respect. Any complaint as to a jury question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically objected to in the trial court. Tex. R. Civ. P. 274; *see Hughes v. Hughes*, No. 13-15-00496-CV, 2017 WL 2705472, at *9 (Tex. App.—Corpus Christi–Edinburg June 22, 2017, pet. denied) (mem. op. on reh'g) (holding that appellant waived her argument concerning the submission of an unpleaded affirmative defense by failing to object to the charge); *Brewer v. Tehuacana Venture, Ltd.*, 737 S.W.2d 349, 352 (Tex. App.—Houston [14th Dist.] 1987, no writ) (same); *see also* Tex. R. App. P. 33.1(a).

13

Because Campbell never objected to Dr. Pompa's failure to plead section 74.153, and because her own pleadings instead put the applicability of that section in issue, she cannot protest this discrepancy on appeal.

## C.     Emergency Medical Care

Next, Campbell contests the evidence supporting the jury's finding that Dr. Pompa's treatment of Tamatha qualified as emergency medical care.  Campbell contends that the great weight and preponderance of the evidence shows that Tamatha's condition on the morning of December 11 lacked the hallmarks of emergency medical care—severity, sudden onset, and the urgent need to address serious risks to health—and the evidence is therefore factually insufficient to support the jury's finding to the contrary.

### 1.     Applicable Law

When conducting a factual sufficiency review, the court of appeals should not substitute its judgment for that of the jury.  *Windrum v. Kareh*, No. 17-0328, 2019 WL 321925, at *13 (Tex. Jan. 25, 2019).  We will set aside a finding for factual insufficiency only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.  *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 127 (Tex. App.—Fort Worth 2016, no pet.).  An opinion reversing for factual insufficiency must detail the relevant evidence and clearly state why the jury's finding is so against

14

the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Windrum*, 2019 WL 321925, at *13.

> The statute provides the following definition of "emergency medical care":
>
> "Emergency medical care" means bona fide emergency services provided after the sudden onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or that is unrelated to the original medical emergency.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(7). The statutory definition of "emergency medical care" as used in section 74.153 has two elements: (1) the type of care provided (i.e., "bona fide emergency services"), and (2) the emergency circumstances under which those services are provided. *Turner v. Franklin*, 325 S.W.3d 771, 776–77 (Tex. App.—Dallas 2010, pets. denied). The second element requires that care be provided after the sudden onset of a condition manifested with acute symptoms so severe that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy or impairment to health. *Id.* at 777. It is the severity of the patient's condition, its rapid or unforeseen origination, and the urgent need for immediate medical attention in order to minimize the risk of serious and negative consequences to the patient's health that comprise the second element. *Burleson*, 487 S.W.3d at 319 (quoting *Turner*, 325 S.W.3d at 777).

15

With regard to the first element, the statute does not define "bona fide emergency services." Any legal term or word of art used in chapter 74 that is not defined "shall have such meaning as is consistent with the common law." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(b). In *Turner*, the court consulted the occupations code to give the term "services" a specialized meaning related to medical care, such that the phrase "bona fide emergency services" was defined as "any actions or efforts undertaken in a good faith effort to diagnose or treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions." *Turner*, 325 S.W.3d at 778. We conclude that this definition is consistent with the common law meaning of these terms.[3] "[I]f such services are provided during the time period and under the circumstances specified in section 74.001(7), they constitute 'emergency medical care' within the meaning of section 74.153." *Id.*

---

[3]"Bona fide" is a Latin phrase that in this context means "in good faith." *Turner v. Franklin*, 325 S.W.3d 771, 778 (Tex. App.—Dallas 2010, pets. denied) (quoting Black's Law Dictionary 168 (7th ed. 1999)). The common law broadly defined the term "services" to include "generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed." *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex. 1962). The word "emergency" is also undefined. We believe its meaning is best explained by reference to the emergency circumstances that are addressed by the second element, discussed above, because "the meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003).

16

## 2. Application

Campbell contends that the great weight of the evidence shows that Tamatha's consultation with Dr. Pompa was not rendered under emergency circumstances. She emphasizes several forms of evidence which suggest that Tamatha's visit to the hospital on December 11 was nothing more than a routine doctor's visit rendered under normal circumstances.

First, Campbell disputes whether her condition had a "sudden onset" under the meaning of the statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(7). She cites medical records indicating that Tamatha's symptoms had been ongoing for two days at the time she saw Dr. Pompa. Campbell contrasts this with other cases decided under section 74.153, which document shorter timeframes for the onset of the patient's condition. *See Martinez-Gonzalez*, 2018 WL 1192242, at *9 (noting patient was treated roughly five hours after onset of condition); *Miller*, 531 S.W.3d at 775 (less than one hour); *Burleson*, 487 S.W.3d at 315 (three hours); *Crocker v. Babcock*, 448 S.W.3d 159, 160 (Tex. App.—Texarkana 2014, pet. denied) (one hour); *see also Sage*, 465 S.W.3d at 401 (noting onset of symptoms upon waking and treatment that evening).

While the facts of these opinions perhaps make a clearer case for the application of section 74.153 than we have here, we do not believe that they define the outer limits of what might constitute a condition of "sudden onset." For instance, in *Ho v. Johnson*, No. 09-15-00077-CV, 2016 WL 638046, at *10 (Tex. App.—Beaumont Feb. 18, 2016, pet. denied) (mem. op.), the court concluded that emergency medical care was rendered

17

as a matter of law where the patient's symptoms had been present for three days. Likewise, in *King v. VHS San Antonio Partners, LLC*, No. SA-16-CV-1201-XR, 2018 WL 2147510, at *4 (W.D. Tex. May 9, 2018) (order), the court took it as a given, in the summary judgment context, that section 74.153 applied even though the patient's condition had been worsening over the course of four days by the time the defendant treated him.

We do not hold that two days' duration is "sudden onset" as a matter of law. Indeed, in the past, we have been hesitant to define an absolute limit for what constitutes a "sudden" occurrence in the medical context: "Absent legislative direction, courts should not affix a specific and precise time frame to [the term 'sudden']." *Tex. Emp'rs Ins. Ass'n v. Duree*, 798 S.W.2d 406, 409 (Tex. App.—Fort Worth 1990, writ denied) (op. on reh'g). The word "suddenly," we said, is a "relative" and "elastic term[], admitting of much variety of definition." *Id.* at 409–10 (quoting *Layton v. Hammond-Brown-Jennings Co.*, 190 S.C. 425, 3 S.E.2d 492, 494 (1939)).

Rather, we think this determination was best left to the trier of fact. The jurors decided that a condition of "sudden onset" was shown, and we decline to substitute our judgment for theirs; it is not manifestly unjust or conscience-shocking to conclude that an ailment of "sudden onset" was present here. *See Windrum*, 2019 WL 321925, at *13. The evidence is not factually insufficient on that account. *See id.*

18

Next, Campbell contests the severity of Tamatha's symptoms as they manifested on December 11. Campbell points to several circumstances which tend to show that she did not have acute symptoms of sufficient severity to qualify as an emergency:

- Tamatha came to the hospital only after going in to work early and completing her normal bus routes, implying that her condition was not so severe that Tamatha felt she had to take off work;

- Tamatha drove herself to the hospital, rather than being transported there by ambulance;

- When she arrived, she was not immediately put on a stretcher or administered oxygen, unlike her emergency room visit on the morning of December 12;

- She was triaged at a level three out of five, which the triage nurse explained meant that she was not necessarily "incredibly ill at that time"; Dr. Pompa explained that a level three patient "should be seen . . . in the following hour" but has "time to wait"; and Campbell's own expert agreed that it was appropriate to triage Tamatha at level three;

- After receiving an EKG, the most severe diagnosis—heart attack—was substantially ruled out; the doctor who initially reviewed Tamatha's EKG results found nothing concerning enough to warrant urgent treatment;

- Following triage, Tamatha was assigned to room eight, whereas the emergency department's policy was for the most severe patients to be close to the front, typically in rooms one and two;

- While Tamatha described her pain level as high, Dr. Pompa himself testified that he put little faith in a patient's subjective description of pain level, saying it was not strongly correlated with the true severity of the condition;

- Within the first ten minutes of her consultation, Dr. Pompa had already ruled out the most serious conditions, concluded that she was most likely suffering from upper respiratory and ear infections, and made the decision to discharge her from the hospital; and

- Ultimately, Dr. Pompa determined that Tamatha's condition was "[n]othing that suggested an emergency."

Campbell places particular emphasis on this last circumstance, arguing that because Dr. Pompa subjectively treated her condition as a non-emergency, he should not be entitled to the protection of an emergency medicine statute. As support, she cites early federal decisions interpreting section 74.153, which held or implied that if the doctor does not recognize or treat the patient's condition as an emergency, the statute does not apply. *Hawkins v. Montague Cty., Tex.*, No. 7:10-CV-19-O, 2010 WL 4514641, at *16 (N.D. Tex. Nov. 1, 2010), *on reconsideration on other grounds*, No. 7:10-CV-

19-O, 2011 WL 13229004 (N.D. Tex. Feb. 28, 2011); *see Guzman v. Mem'l Hermann Hosp. Sys.*, No. H-07-3973, 2009 WL 780889, at *7 (S.D. Tex. Mar. 23, 2009).

We disagree with these federal cases to the extent that they hold that the doctor's assessment is controlling. Since these cases were decided, Texas courts have rejected the notion that section 74.153 applies only when a physician diagnoses a condition as an emergency and treats it accordingly. *Turner*, 325 S.W.3d at 778–79; *see Burleson*, 487 S.W.3d at 321. Texas courts have reasoned that the statute's use of the phrase "could reasonably be expected" makes clear that whether the circumstances constitute "emergency medical care" should generally be viewed "prospectively and objectively, not retrospectively or subjectively" according to the treating physician's perspective.[4]

---

[4]These federal courts drew support from opinions interpreting two provisions found in federal statutes, including the Emergency Medical Treatment and Active Labor Act (EMTALA), which the *Guzman* court viewed as "nearly identical" to section 74.153. *See Guzman v. Mem'l Hermann Hosp. Sys.*, No. H-07-3973, 2009 WL 780889, at *6 (S.D. Tex. Mar. 23, 2009) (citing 42 U.S.C.A. §§ 1395dd(e)(1)(A), 1396b(v)(3)). Because of the similarities, the court drew upon federal cases which hold that under EMTALA, the hospital will be liable only if it has subjective awareness of the patient's emergency medical condition. *See id.*; *see, e.g.*, *Fewins v. Granbury Hosp. Corp.*, 662 F. App'x 327, 334 (5th Cir. 2016) (per curiam) (requiring "actual knowledge" of an emergency medical condition before liability will attach under EMTALA).

But there is a distinction between EMTALA and section 74.153 which makes the comparison imperfect. EMTALA provides that a hospital has a duty to stabilize the patient if the "hospital *determines* that the individual [seeking treatment] has an emergency medical condition." *Elmhirst v. McLaren N. Mich.*, 726 F. App'x 439, 444 (6th Cir. 2018) (alteration in original) (emphasis added) (quoting 42 U.S.C.A. § 1395dd(b)), *cert. denied sub nom. Elmhirst v. McLaren N. Mich. Hosp.*, 139 S. Ct. 325 (2018). Section 74.153 has no similar provision limiting its application to situations where the emergency medical provider actually and subjectively determines that an emergency

But we do not go so far as to hold that the doctor's perspective is wholly irrelevant. We do not think that in using the phrase "could reasonably be expected," the Legislature intended for us to adopt an extreme analytical construct wherein the opinion of the diagnosing physician—the medical expert who directly examined the patient on the day her symptoms manifested—is wholly discounted, and a medically untrained judge's "objective" view of the patient rules the day. If the doctor's voice is not to be heard, certainly no one told the jury that; as the trier of fact, it is only natural that the jury would weigh the doctor's belief that the patient's condition did not constitute an emergency. *Cf. Miller*, 531 S.W.3d at 780 (assigning great weight to the fact that the diagnosing doctor subjectively believed the patient was suffering a heart attack). Indeed, under section 74.153's gross negligence inquiry, a central issue is whether the doctor subjectively appreciated the patient's risk of serious harm. It would be incongruous to hold that the doctor's perspective is wholly irrelevant to one part of the section 74.153 analysis, but integral to the other—with the jury never being told the difference between these two highly similar parts. Thus, the doctor's perspective is probative of what constitutes an "emergency medical condition," but not necessarily controlling. *See Univ. of Fla. Bd. of Trs. v. Stone ex rel. Stone*, 92 So.3d 264, 270 (Fla. Dist. Ct. App. 2012) (concluding, under a nearly identical statute, that the proper inquiry "does not hinge solely" on objective considerations "nor does it depend solely on the

---

exists. Thus, there is nothing in section 74.153 which compels the same exclusive focus on actual knowledge.

physicians' subjective view of the patient's condition at the time; rather, it takes into account both considerations").

Instead of adopting Dr. Pompa's perspective or concentrating on the evidence suggesting there was no emergency, the jury could have placed greater stock in other circumstances which indicate that Tamatha did receive emergency medical care on December 11. Tamatha sought treatment at the emergency room immediately after she got off work, implying that she did not feel there was time to wait to see her primary care provider. She was triaged as "urgent." *See Crocker*, 448 S.W.3d at 167 (relying on the patient's triage as "urgent" to conclude that emergency medical care was rendered). Campbell's own expert testified that Tamatha's highly elevated blood pressure was "life-threatening" by itself, stating that it could have resulted in "stroke, heart attack, kidney failure, other neurologic problems, seizures, [or] bleeding." Tamatha described her pain level as a ten out of ten, and the statute expressly includes "severe pain" among the symptoms that may give rise to an emergency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(7). Tamatha's chest tightness and pain raised fears that she was suffering a heart attack, and within her first minutes in the emergency department, an EKG was performed, which returned "abnormal" results. *See Burleson*, 487 S.W.3d at 321 (concluding that severe chest pain indicative of a heart attack gave rise to emergency medical care). While heart attack was eventually ruled out, "the very act of diagnosing the patient" to rule out this possibility might fairly be considered part of bona fide emergency services. *See Turner*, 325 S.W.3d at 779. Dr. Pompa prescribed a cocktail of

23

"strong" steroids, painkillers, and antibiotics to address her perceived condition. He diagnosed Tamatha with an upper respiratory infection, but even this diagnosis did not prevent the jury from concluding that Tamatha's symptoms were acute, severe, urgent, and reasonably likely to result in serious jeopardy to the patient's health absent medical attention. *See Craig v. Dearbonne*, No. 09-08-00435-CV, 2009 WL 349140, at *1 (Tex. App.—Beaumont Feb. 12, 2009, no pet.) (mem. op.) (documenting a patient's death from respiratory infection). Indeed, in the absence of appropriate care, the same constellation of symptoms resulted in Tamatha's irreversible brain injuries within twenty-four hours.[5]

Thus, considering all the relevant evidence, we cannot say that the jury's finding of emergency medical care was contrary to the overwhelming weight of the evidence. *See Super Ventures*, 501 S.W.3d at 127. We hold that the evidence is factually sufficient to support the jury's determination that Dr. Pompa rendered emergency medical care to Tamatha. Campbell therefore was properly required to satisfy a heightened standard

---

[5]In the alternative, Campbell cites the statute's proviso that the term emergency medical care "does not include medical care or treatment that occurs after the patient is *stabilized* and is capable of receiving medical treatment as a nonemergency patient." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(7) (emphasis added). Campbell argues that even assuming Tamatha originally presented an emergency when she was first triaged at 9:20 a.m., she stabilized at some point prior to her consultation with Dr. Pompa at 10:09 a.m. We decline to slice the encounter so finely. Nothing about the hour of emergent testing and evaluation that she received before she saw Dr. Pompa requires the conclusion that she had stabilized. Indeed, before she saw Dr. Pompa, she had not even received an initial diagnosis, and her symptoms remained as acute as they had been at triage.

of proof—gross negligence—in order to prevail against Dr. Pompa as well as Dr. Weatherall.

We overrule Campbell's first issue.

### III.   Gross Negligence

In her second issue, Campbell brings a factual sufficiency challenge against the jury's finding that Dr. Pompa and Dr. Weatherall did not act with gross negligence. She asserts that the great weight and preponderance of the evidence shows that both doctors consciously disregarded an extreme risk to her mother's health.

### A.   Applicable Law

Gross negligence consists of both objective and subjective elements. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). Plaintiffs must prove that (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *Id.* Under the objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. *Id.* The subjective prong, in turn, requires that the defendant knew about the risk, but that the defendant's acts or omissions demonstrated indifference to the consequences of its acts. *Id.*

**B.     Dr. Pompa**

At trial, Campbell's main theory was that Tamatha was suffering from angioedema, and Dr. Pompa should have recognized this fact and admitted Tamatha to the hospital on the morning of December 11. Campbell also asserts that Tamatha was suffering from severely elevated blood pressure, which also should have led Dr. Pompa to admit her to the hospital. According to Campbell, admission to the hospital, in turn, would have led to earlier and more effective efforts to preserve Tamatha's airway, preventing her injury.

To satisfy the subjective awareness prong, Campbell directs our attention to evidence that Dr. Pompa was admittedly aware of three things: (1) the signs and symptoms of angioedema, (2) Tamatha's elevated blood pressure, and (3) the fact that a nursing assessment was not performed prior to Dr. Pompa's evaluation, but was instead performed after the doctor's visit.

As to points two and three, Dr. Pompa's awareness of these things does not contribute to gross negligence. Multiple witnesses testified that elevated blood pressure, by itself, is not sufficient for admission to a hospital. Further, Dr. Pompa testified that the nursing evaluation was wholly consistent with his diagnosis, and it yielded no additional symptoms of angioedema that Dr. Pompa might have missed.

As to point one, while Dr. Pompa may have been aware of the general signs of angioedema, there was little to no evidence that Dr. Pompa should have been aware that Tamatha was suffering from angioedema. Instead, at trial, Dr. Pompa convincingly

laid out the case for why angioedema was never considered as a potential diagnosis for her symptoms. Dr. Pompa testified that with angioedema, painless swelling of the head or neck is almost always the sole complaint. According to Dr. Pompa's witnesses and the medical records, no one in the emergency room—not the nurses, the EKG technician, or Dr. Pompa himself—observed any signs of swelling on December 11, despite their extensive interactions with Tamatha. Dr. Pompa performed a direct examination of her mouth and came within an inch of her face to examine her ear, and a nurse performed a strep test which required her to take a swab of Tamatha's throat, but neither noted any signs of swelling in her neck. To the contrary, after examination Dr. Pompa noted that Tamatha's neck was "supple." Dr. Pompa also introduced two theories as to why, even if Tamatha was generally suffering from swelling, that symptom was not observed and documented on the morning of December 11. First, it was undisputed that Tamatha underwent treatment with steroids on December 10, and steroids are often prescribed to reduce swelling; Dr. Pompa theorized that the steroids might have reduced Tamatha's swelling on December 11, only to recur on December 12. Second, various witnesses described Tamatha as morbidly obese, and there was some suggestion that her habitus might have masked any swelling that was present.

Moreover, unlike a typical angioedema case, Tamatha reported severe pain. Dr. Pompa testified that while he had seen at least a hundred patients with angioedema, he had never heard one of those patients complain of a sore throat like Tamatha did.

And there was no evidence that Tamatha's other symptoms corresponded with a diagnosis of angioedema.

According to the creditable evidence, the *sine qua non* of angioedema—swelling—was either not present or justifiably missed, and those other symptoms which were present seemed contrary to a diagnosis of angioedema. Because the greater weight of credible evidence showed that Dr. Pompa was *not* subjectively aware of any risk of angioedema and had little reason to be, Campbell's case against him fails on the subjective awareness prong of gross negligence. *See id.*; *Burleson*, 487 S.W.3d at 324 (concluding plaintiff had failed to raise a fact issue as to actual awareness in light of testimony that doctor subjectively believed patient had stabilized and no longer required emergent treatment). We conclude that the evidence is factually sufficient to support the jury's finding of no liability as to Dr. Pompa. *See Windrum*, 2019 WL 321925, at *13.

## C. Dr. Weatherall

Campbell next contests the jury's finding that Dr. Weatherall was not grossly negligent in treating Tamatha on December 12. Campbell's experts agreed that at first, Dr. Weatherall acted appropriately by aggressively responding to Tamatha's symptoms. However, according to Campbell, Dr. Weatherall committed multiple departures from the standard of care with awareness of the severe risk involved. Campbell's complaints can be put into two groups: (1) that Dr. Weatherall administered sedatives too early, then allowed Tamatha to wait for nearly an hour, in increasing respiratory distress, without taking any further action to protect her airway; and (2) that he allowed Tamatha

28

to be moved to the operating room without accompanying her, even though no one there was prepared to perform a surgical airway, and he thus failed to communicate adequately with other medical providers to ensure that Tamatha received proper care.

First, Campbell faults Dr. Weatherall for administering sedatives too early, possibly contributing to Tamatha's respiratory emergency. Dr. Weatherall testified that he was aware that when given in high enough doses, the sedatives that he administered at 6:15 a.m. can act as respiratory depressants. Campbell's expert criticized Dr. Weatherall's decision to administer the sedatives so early, saying they should only be administered right before intubation.

However, there was contrary evidence to show that Dr. Weatherall's administration of sedatives was sound and medically appropriate. Dr. Weatherall explained in his testimony that the sedatives had multiple medical benefits, both in reducing the patient's anxiety and in preparing her for the intubation that he reasonably believed was necessary and imminent. Moreover, he testified that the doses he administered were very low and not nearly to the level that would depress her respiratory drive. Finally, there was no evidence that Tamatha showed signs of decreased respiratory drive; rather, witnesses testified that Tamatha was fighting to breathe until her airway closed completely. The great weight of the evidence, therefore, does not demonstrate that administering sedatives involved an extreme degree of risk. *See U-Haul*, 380 S.W.3d at 137.

Next, by Campbell's account, Dr. Weatherall was grossly negligent in that he sent Tamatha to the operating room even though Dr. Tan was not at the hospital and none of the anesthesiologists who were present could perform a surgical airway procedure. As Campbell points out, Dr. Weatherall testified that airway swelling can be a volatile situation, and he was aware that if Tamatha's airway was not secured, she could stop breathing and die.

But in his testimony, Dr. Weatherall disputed that he was wrong in sending Tamatha to the operating room, because he believed that multiple physicians capable of performing an emergency airway procedure were already there. Dr. Weatherall denied knowing that Dr. Tan was not at the hospital, saying that his conversation with Dr. Tan left him with the impression that Dr. Tan was already at the hospital: "No one at any point told me that he was not there. [Dr. Tan] told me he would meet the team in the OR, never gave me any indication whatsoever that he was not on campus, that it would take him 30, 45 minutes to get there." Dr. Weatherall testified that he reasonably believed Dr. Tan was at the hospital because surgeons typically get to the hospital early in the morning and because Dr. Tan never indicated he was not at the hospital. Even Campbell's expert was uncertain whether Dr. Weatherall was made aware that Dr. Tan was not at the hospital. Campbell's expert felt confident that Dr. Weatherall took no steps to ensure that a physician trained in surgical airways would be present, but this goes to negligence, not the subjective awareness that is required to establish gross negligence.

Moreover, Dr. Weatherall also pointed out that when he sent Tamatha to the operating room, an anesthesiologist was already present. According to many witnesses, including Campbell's expert, anesthesiologists are generally regarded as airway experts who are trained to perform surgical airway procedures. There was nothing in the record which intimates that Dr. Weatherall should have been aware that this particular anesthesiologist would be unable to perform a surgical airway procedure.

There was only one witness who gave evidence suggesting that Dr. Weatherall was aware Dr. Tan was not at the hospital. According to one nurse, Dr. Weatherall held a planning session in which he asked the nurse, "Do you want to move the patient to the OR and be set up for the patient, where the patient will be in the most appropriate setting when Dr. Tan gets here to perform his tracheostomy?" However, by his own concession, the nurse's memory of these events was inexact.

Standing by itself, we do not view this lone bit of testimony as enough to demonstrate Dr. Weatherall's subjective awareness to the level required to render the evidence factually insufficient. *See id.* The vast majority of the record evidence does not suggest that Dr. Weatherall was subjectively aware that Tamatha would be left in limbo when she was sent to the operating room. We therefore find that the jury's verdict as to Dr. Weatherall was not against the great weight and preponderance of the evidence. *See Windrum*, 2019 WL 321925, at *13.

We overrule Campbell's second issue.

## IV.    E-Jury System

In her third issue, Campbell challenges the system by which her venire panel was selected, which she refers to as the "e-jury system." Campbell objected that this e-jury system creates bias against certain demographic classes, which manifested itself in her statistically skewed venire panel and thus violated her right to have a venire that is fairly representative of the community.

According to Campbell's motion, Tarrant County's system allows people to respond to jury questionnaires online or via mail. When responding to the questionnaire online, eligible jurors are told to report directly to a specific court where they will participate in jury selection as part of a venire. Those who respond by mail are told to report to a central jury room, where they are then assigned to courts and venires randomly. The electronically assembled venires thus become a group distinct from the central jury room venires.

According to Campbell, this e-jury system results in venire panels that disproportionately represent certain groups. She reasons that people who participate in the e-jury system, by definition, would need to have access to an internet-enabled device such as a computer, tablet, or smartphone. She cites one national study by the Pew Research Center which found significant demographic gaps between those who do and do not own computers, smartphones, and tablets. For instance, according to the Pew study, 45% of African Americans own a computer, as compared to 79% of Caucasians. Similarly, the study reports that college graduates are almost twice as likely

to own a smartphone as those who did not complete high school—81% compared to 41%. Also according to the study, those who earn more than $75,000 per year are roughly twice as likely to own a tablet computer as those who earn less than $30,000 per year. And those over 65 years of age are significantly less likely to own a computer, smartphone, or tablet than those between the ages of 18 and 29 years. Campbell reasons that because of self-selection bias, any e-jury venire is significantly more likely to be affluent, Caucasian, educated, and younger than its counterparts drawn from the ordinary jury pool. After considering these arguments, the trial court denied her challenge to the e-jury system.

On appeal, Campbell further argues that this bias was reflected in her venire, which was drawn from the e-jury array. However, she cites no record evidence to demonstrate the composition of her venire. Nonetheless, she argues there was a disparity between the demographics of those on her venire panel and the percentages that would otherwise be expected based on the makeup of the community, according to census data for Tarrant County. Campbell says her venire compares to Tarrant County's population as follows:

| Race | Tarrant County Population | Alleged Actual Venire | % Difference |
|---|---|---|---|
| Caucasian | 49.8% | 77% | 27.2% |
| Hispanic | 27.6% | 8% | -19.6% |
| African American | 15.1% | 8% | -7.1% |
| Asian/Pacific Islander | 5.1% | 7% | 1.9% |
| Other | 2.4% | 0% | -2.4% |

Campbell also states that there was a significant difference between the education levels of those who sat on her venire and those that could be expected based on a national survey:

| Education Level | National Average | Alleged Actual Venire | % Difference |
|---|---|---|---|
| No High School | 11.6% | 1% | -10.6% |
| High School Graduate | 29.5% | 29% | -0.5% |
| Some College | 16.6% | 10% | -6.6% |
| Associate's Degree | 9.8% | 6% | -3.8% |
| Bachelor's Degree | 20.5% | 32% | 11.5% |
| Graduate Degree | 12% | 21% | 9% |

Again, she cites no evidence that would bear out her account of the venire's education level. Still, Campbell surmises that both of these alleged disparities can be attributed to the fact that her venire was drawn from the e-jury system.

Campbell maintains that this violates her right to a fair trial before an impartial jury drawn from a fair cross-section of the community. As support, she relies on an opinion from this court, *Mendoza v. Ranger Insurance Co.*, 753 S.W.2d 779 (Tex. App.—Fort Worth 1988, writ denied). In *Mendoza*, this court sustained a challenge to a deferral system which often allowed teachers to postpone their jury service during the spring, resulting in a summer venire for Mr. Mendoza's case that was composed of nearly 50% teachers. *Id.* at 779–80. We offered only one proposition of law to govern our analysis on the fair-cross-section issue—"Every citizen is entitled to a fair and impartial trial before an impartial jury, fairly representative of the community"—based on only one civil citation to a case from 1946. *Id.* at 781 (citing *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220, 66 S. Ct. 984, 985 (1946)).

Importantly, the *Mendoza* court did not cite the body of law in which the fair-cross-section requirement is best developed: criminal jurisprudence flowing from the seminal cases of *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692 (1975), and *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664 (1979). In *Duren*, a murder case, the court dealt with a system which allowed women to opt out of jury service. *Duren*, 439 U.S. at 360–62, 99 S. Ct. at 666–67. The defendant's statistical evidence showed that although 54% of the relevant county's population were women, they made up only 14.5% of its venires over the course of a year—and only 15.5% of its venires on the week the defendant's case was tried. *Id.* at 362–63, 99 S. Ct. at 667–68. The court held that "to establish a prima facie violation of the fair-cross-section requirement," the criminal defendant

must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Id.* at 364, 99 S. Ct. at 668. The *Duren* court examined each of these elements in turn, holding that women were a distinct group in the community, that a nearly 40% absolute disparity was not fair and reasonable relative to the community, and that this disparity was almost certainly due to Missouri's opt-in system, which applied solely to women. *See id.* at 364–67, 99 S. Ct. at 668–70.

Since *Duren* was a criminal case based largely on the Sixth Amendment, which applies only to "criminal prosecutions,"[6] it has spawned a wealth of criminal cases that have thoroughly developed the standards for these elements. *See, e.g., Johnson v. McCaughtry*, 92 F.3d 585, 593 (7th Cir. 1996) (collecting ten criminal cases from circuit courts addressing the narrow question of whether young people count as a distinctive group under the first element of *Duren*). Civil cases espousing the right to an impartial jury drawn from a fair cross-section of the community—like our opinion in *Mendoza*—are rarer and generally offer less examination of the problem. *See, e.g., Bershatsky v. Levin*, 99 F.3d 555, 556–57 (2d Cir. 1996) (per curiam).

---

[6]U.S. Const. amend. VI.

The question remains whether we should apply the requirements of *Duren* in this civil case, or whether we should do as we did in *Mendoza* and simply decide the matter without elaboration. We believe the former is the better approach. If the right exists in civil cases to have a venire drawn from a fair cross-section of the community—and we have held that there is such a right—it should be subject to *Duren's* well-developed guidance on what constitutes a violation of that right. Questions of this magnitude deserve structure for the sake of consistent and just application, rather than a rudderless trip through the individual judge's conscience. Moreover, *Duren* rested on due process as well as the Sixth Amendment, and due process certainly applies to civil cases. *McGinnis v. M. I. Harris, Inc.*, 486 F. Supp. 750, 755 (N.D. Tex. 1980) (order). And because of the special role of juries in criminal cases, there may be less tolerance for deviation from their representative nature than in civil cases; it follows that there must be "equal or greater bias" to a *Duren* violation in order to establish a fair-cross-section claim in a civil context. *Id.* at 755 & n.4.

This approach is also consistent with federal law. Citing *Thiel*, the Fifth Circuit has held that the "tradition of trial by an impartial jury drawn from a cross-section of the community applies to both civil and criminal proceedings," just as we held in *Mendoza*. *Timmel v. Phillips*, 799 F.2d 1083, 1086 & n.5 (5th Cir. 1986) (citing *Thiel*, 328 U.S. at 220, 66 S. Ct. at 985–86). The Fifth Circuit then applied *Duren* to analyze the fair-cross-section claim that was raised by the medical malpractice plaintiff. *Id.* Other federal courts have also applied the requirements of *Duren* to civil cases. *See, e.g.*, *Medina*

37

*v. Loveless*, 1995 WL 678262, at \*2 (4th Cir. 1995) (per curiam); *Mitchell v. Morgan*, 844 F. Supp. 398, 403 (M.D. Tenn. 1994), *aff'd sub nom. Thandiwe v. Morgan*, 41 F.3d 1508 (6th Cir. 1994).[7]

Thus, we will evaluate Campbell's fair-cross-section claim according to the dictates of *Duren.*  We review the denial of her claim for abuse of discretion.  *Mendoza*, 753 S.W.2d at 781; *cf. Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 515 (Tex. 2008) (reviewing *Batson* challenges to jury selection for abuse of discretion).

Under *Duren*, Campbell was first required to show that the group alleged to be excluded is a "distinctive" group in the community.  *Duren*, 439 U.S. at 364, 99 S. Ct. at 668.  In her brief, Campbell asserts that venires derived from the e-jury system "will likely be disproportionately Caucasian, educated, affluent, and young."  As we understand her argument, Campbell contends that e-jury venires tend to exclude several individual groups:  non-Caucasians, the less educated, the poor, and the elderly.[8]  While

---

[7]Still other courts have assumed without deciding that *Duren* applies to fair-cross-section claims in civil cases.  *See, e.g.*, *Williams v. City of Cleveland*, 848 F. Supp. 2d 646, 659 (N.D. Miss. 2012); *McGinnis v. M. I. Harris, Inc.*, 486 F. Supp. 750, 755 (N.D. Tex. 1980) (order).  And some circuits have adopted *Duren's* framework for analyzing claims under the Jury Selection and Service Act of 1968 ("JSSA"), which also guarantees the right to a jury chosen from a fair cross-section of the community, and which applies to federal civil cases.  *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (concluding that the test for a fair cross-section under the JSSA should be "essentially identical" to the *Duren* test); *see Omotosho v. Giant Eagle, Inc.*, 997 F. Supp. 2d 792, 796–97 (N.D. Ohio 2014) (cataloging cases and applying *Duren* to a JSSA claim in a civil case).

[8]If Campbell's complaint is that a single group which shares all of these qualities—poor, ill-educated, elderly non-Caucasians—was excluded, her argument fails.  Courts have generally "reject[ed] the concept of adding together 'cognizable

race generally qualifies for protection under *Duren*,[9] *see Pondexter v. State*, 942 S.W.2d 577, 580 (Tex. Crim. App. 1996), there is some reason to doubt whether these other groups are cognizable. As to the elderly, "every circuit that has considered this issue" has concluded that age groups are not "distinctive" enough to be cognizable. *Barber v. Ponte*, 772 F.2d 982, 1000 (1st Cir. 1985) (en banc); *see Silagy v. Peters*, 905 F.2d 986, 1010 (7th Cir. 1990) (determining persons over seventy were not a cognizable group). Some courts have held that "less educated individuals" do not constitute a distinctive group. *Anaya v. Hansen*, 781 F.2d 1, 8 (1st Cir. 1986) (collecting cases); *United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir. 1977). And the Supreme Court has reserved judgment as to "whether a showing of economic discrimination would be sufficient to establish a

---

groups' so as to make a separate 'cognizable group.'" *United States v. Underwood*, 617 F. Supp. 713, 718 (N.D. Ala. 1985) (concluding that white males were not a distinctive subgroup); *see United States v. Barlow*, 732 F. Supp. 2d 1, 27–28 (E.D.N.Y. 2010) (expressing doubt that African American males constituted a cognizable subgroup and collecting cases), *aff'd*, 479 F. App'x 372 (2d Cir. 2012). Recognizing this hybrid category "as a *Duren* distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded" by *Duren*, "which requires only a cross-section that is fair, not one perfectly attuned to multiple variables." *United States v. Greer*, 900 F. Supp. 952, 957–58 (N.D. Ill. 1995); *see Underwood*, 617 F. Supp. at 718 (stating the court's concern that a party might "argue for a merger of . . . black, female, poor, elderly Catholics and find that the percentage of the group thus combined is terribly underrepresented or terribly over represented in the jury pool").

[9]*But see United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) ("Any group which might casually be referred to as 'non-whites' would have no internal cohesion, nor would it be viewed as an identifiable class by the general population."). We withhold any opinion as to whether *Suttiswad* is correct.

prima facie *Duren* violation." *Rivas v. Thaler*, 432 F. App'x 395, 403 (5th Cir. 2011) (per curiam); *see Berghuis v. Smith*, 559 U.S. 314, 333 n.6, 130 S. Ct. 1382, 1396 n.6 (2010).

Regardless, we need not decide whether these groups are cognizable under the first element of *Duren*, for even assuming that Campbell satisfied the first element, she has failed to introduce any evidence to support the other elements, underrepresentation and systematic exclusion. Campbell alleges the demographics of her venire were skewed, but she has not directed our attention to anything in the record that would prove the composition of her venire. In her brief, Campbell's sole record citations on this subject are to a blank jury questionnaire and counsel's argument during voir dire. The blank questionnaire proves nothing, and arguments of counsel do not constitute evidence. *Black v. Shor*, 443 S.W.3d 170, 180 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.).

But even accepting Campbell's allegations as true, she would not have established a prima facie case, because Campbell's allegations focus on the composition of her venire alone. "[D]isproportionate representation in a single panel does not demonstrate the systematic exclusion of distinctive groups in violation of appellant's rights . . . ." *Pondexter*, 942 S.W.2d at 581 (quoting *May v. State*, 738 S.W.2d 261, 269 (Tex. Crim. App. 1987)); *see Duren*, 439 U.S. at 366, 99 S. Ct. at 669 (holding that to establish a prima facie case, "it was necessary" for the defendant to show underrepresentation "generally and on his venire" and that the defendant satisfied this burden by showing the composition of venires over the course of nearly a year). She was required to

40

demonstrate, then, not only that a distinctive group was "not adequately represented on [her] jury venire but also that this was the general practice in other venires." *Timmel*, 799 F.2d at 1086. Campbell offered nothing to indicate the composition of the many other venires that were drawn from the e-jury system. Her claim thus fails for want of proof. *See Weeks v. State*, 396 S.W.3d 737, 744–45 (Tex. App.—Beaumont 2013, pet. ref'd) (rejecting a fair-cross-section challenge to an e-jury system based on lack of statistical evidence).[10]

We remain mindful of the cherished values of equality and impartiality, and we are not unsympathetic to Campbell's claim that those values were mislaid in her venire. But we, as judges of the law, are bound to decide the case based on what the evidence shows. Because Campbell failed to present any evidence, and because her allegations, even if true, do not approach the level required to satisfy *Duren*, the trial court did not abuse its discretion by rejecting her fair-cross-section claim. *See Mendoza*, 753 S.W.2d at 781. We overrule Campbell's third issue.

## V.     Admission of Evidence Concerning TotalCare

In her fourth issue, Campbell argues that the trial court abused its discretion by allowing the admission of evidence concerning her former claims against TotalCare. In the trial court, Campbell filed a motion in limine and argued that this evidence was

---

[10]*Cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2245 (2019) (explaining the power of statistical evidence in *Batson* challenges to jury selection).

41

irrelevant because her claims against TotalCare had been nonsuited. Even if relevant, Campbell contended that any probative value was substantially outweighed by the risk of unfair prejudice. The trial court denied the motion in limine but granted Campbell a running objection.

However, at trial, Campbell exposed these facts herself by discussing her nonsuited TotalCare claims during opening argument:

> We also dismissed Tamatha's claims against [TotalCare], which we had brought initially. We had sued [TotalCare], but the evidence has shown that [TotalCare] did not cause Tamatha's injuries, and so the case was dismissed. No settlement was made. No money was paid, absolutely nothing. Unlike—the doctors in the hospital, the evidence will show that they are responsible for Tamatha's horrible injuries.

A party opens the door to otherwise objectionable evidence offered by the other side when it introduces the same evidence or evidence of a similar character. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 473 (Tex. 1998). When a party opens the door to evidence, she may not be heard to complain of the admission of that evidence when offered by the other side. *Tex. Dep't of Transp. v. Olson*, 980 S.W.2d 890, 898 (Tex. App.—Fort Worth 1998, no pet.). The supreme court has entertained the notion that a party may open the door to the mention of other, related lawsuits by being "the first to allude to the other lawsuits in opening statements." *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 234 (Tex. 2011).

Because Campbell was the first to introduce the jury to the existence of her TotalCare claims during opening argument, she may not be heard to complain of

appellees' evidence concerning those claims. *See Olson*, 980 S.W.2d at 898. We overrule Campbell's fourth issue.

## VI. Conclusion

We affirm the judgment of the trial court.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: August 15, 2019